McHugh, J.
1. BACKGROUND
This is a civil action filed by Kevin Minnehan (“Minnehan”) pursuant to G.L.c. 30A, §14 seeking review of a decision of the Department of Social Services (“DSS”) (1) to “support” a report lodged with DSS under G.L.c. 119, §51A that accuses Minnehan of sexual abuse of a child, see G.L.c. 119, §51B; 110 C.M.R. §4.32 and (2) to list him in the DSS “Registry of Alleged Perpetrators” (“Registry”). See G.L.c. 18B, §7(b); 119, §5IF; 110 C.M.R. §§4.36,[1] 4.37[2] (1996). Both parties have filed motions for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) and Superior Court Standing Order 1-96(4).
2. THE RECORD
Much information the record contains will be discussed in detail momentarily. For overview purposes, however, the record reveals that Minnehan was a consultant for Evergreen Community Services (“Elver-green”), a social services program in Malden, as well as for the Woburn YMCA (“YMCA”). As a consultant to those organizations, Minnehan mentored troubled children. Minnehan received awards for his work from Evergreen in 1986 and from the YMCA in 1996 and 1997.
J.C. was born on March 31, 1987. Minnehan served as J.C.’s mentor during the time J.C. was 8 to 10 years old. Initially, Minnehan was J.C.’s “Big Brother” and acted in that capacity under the auspices of Evergreen. After the formal “Big Brother” relationship ended in June 1996, Minnehan continued to mentor J.C. in an informal capacity. During the latter period, J.C.’s mother, Joan, made token payments to Minnehan for his services.
On August 17 and 18, 1997, J.C. told Joan that Minnehan had engaged in oral and anal sex with him, that Minnehan paid J.C. for these acts and that Minnehan said that he would kill anyone J.C. told about these events. J.C. also told Joan that Minnehan had engaged in the same conduct with another boy named John. Joan apparently reported J.C.’s statements to a “mandated reporter,” see G.L.c. 119, §51A, who reported them to the DSS on Wednesday, August 20, 1997. On Monday, August 25, 1997, DSS staff designated a DSS “Special Investigator” (the “First Investigator”) to investigate J.C.’s allegations.
The First Investigator interviewed Joan, Evergreen Director Donna Sands (“Sands”); Kathleen Shaw (“Shaw”), Director of Children’s Connection, apparently a residential treatment and education facility in which J.C. was then enrolled and had been for approximately two months; Rita Robertson (“Robertson”), J.C.’s therapist at Children’s Connection; and Karen Willinski, J.C.’s CHINS (“Child in Need of Services”) attorney.
On Wednesday, August 27, 1997, a SAIN (“Sexual Abuse Intervention Network”) Team[3] interviewed J.C. During the interview, J.C. repeated, orally and in writing, his allegations that Minnehan molested him. Later that day, the First Investigator filed a report concluding that the allegations were “supported,” that Minnehan’s name should be listed in the Registry and that the completed investigatory report should be referred to the District Attorney. G.L.c. 119, §51F; 110 C.M.R. §4.32(2). Still later that day, the First Investigator’s supervisor, Scott R. Chapman, filed a supervisory review note agreeing with the First Investigator’s conclusions.
The First Investigator did not interview Minnehan during her investigation. Although Minnehan was away on vacation from August 21 through 25, 1997, he was available thereafter. After multiple requests from Sands that someone from DSS speak to Minnehan about J.C.’s allegations, another DSS investigator (the “Second Investigator”) interviewed Minnehan on September 4, 1997, eight days after the DSS investigation had concluded. *366 DSS informed Minnehan of its conclusions. Thereafter, Minnehan requested a “fair hearing” pursuant to 110 C.M.R. §10.06(8). The hearing was conducted on April 15, 1998, before a DSS Hearing Officer. During the hearing, Minnehan, two witnesses with some knowledge of J.C. and of Minnehan’s character, the First Investigator and the Second Investigator presented testimony. Minnehan also presented some letters from individuals who spoke favorably of him as well as two letters from Joan. Apart from the testimony favorable to Minnehan presented by Minnehan and his two witnesses, all of the testimony at the hearing was hearsay.
On August 17, 1998, the Hearing Officer issued an opinion affirming the DSS decisions. Minnehan filed this petition for judicial review on September 17,1998.
3. STATUTES & REGULATIONS
Under the governing statute, “mandated reporters” must report to DSS allegations of, inter alia, sexual abuse they receive. G.L.c. 119, §51A. DSS then is required to conduct an investigation of those allegations. Id. Under DSS regulations, the investigation is designed to determine whether the allegations are “supported” or “unsupported.” 110 C.M.R. §4.32(1). Accordingly, the investigation must “include consulting with the reporter, checking Department files and the Central Registry, arranging medical examination(s) where appropriate, and making any collateral contacts necessary to obtain reliable information which would corroborate or disprove the reported incident and the child’s condition.” 110 C.M.R. §4.27(2)(emphasis added).
DSS “supports” a §51A report if it is persuaded that there is reasonable cause to believe that an incident of sexual abuse by a “caretaker”[4] occurred. 110 C.M.R. §4.32(2). The regulations define “reasonable cause to believe” as
a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been abused or neglected.
110 C.M.R. §4.32(2). See also Care & Protection of Robert, 408 Mass. 52, 63 (1990) (“reasonable cause” means “known or suspected instances of child abuse and neglect”).
As the regulatory definition of “reasonable cause to believe” suggests, a DSS conclusion that a report is “supported” does not necessarily mean that the DSS believes that a specifically named “alleged perpetrator” “abused” the child who was the subject of the report. See 110 C.M.R. §§4.32(2), 4.33, Examples D, F. Moreover, “reasonable cause to believe” apparently is not the same thing as “substantial evidence,” because an “alleged perpetrator” of child abuse is listed in the Registry only if (1) the allegations in the 51A report are, after investigation, “supported” and referred to the District Attorney pursuant to G.L.c. 119, §51B(4), and (2) there is substantial evidence that the alleged perpetrator was responsible for a child’s abuse or neglect. 110 C.M.R. §4.37. Under the regulations, “substantial evidence” is defined, as it is in G.L.c. 30A, as “such evidence as a reasonable mind might accept as adequate to support a conclusion.”
The Registry itself ostensibly was created and is maintained pursuant to G.L.c. 18B, §7(b). The “abuse” with which it is concerned is defined as
the non-accidental commission of any act by a caretaker upon a child under age 18 which causes, or creates a substantial risk of physical or emotional injuiy, or constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual.
110 C.M.R. §2.00 (emphasis in original).
After the DSS makes a decision to “support” a report of “abuse” or to add an individual’s name to the Registry, an individual targeted in the DSS decision has a right to an administrative appeal. 110 C.M.R. §10.06(8). Appellate proceedings take place before hearing officers employed by the DSS. 110 C.M.R. §10.03. At the hearing, the burden is on the targeted individual to show by a preponderance of the evidence that the DSS decision or procedural actions were not in conformity with DSS policies or regulations or that DSS acted without a reasonable basis or in an unreasonable manner which resulted in substantial prejudice to the appealing parly. 110 C.M.R. §10.23. If the targeted individual fails to make that showing, the hearing officer must affirm the DSS decision.
If the hearing officer affirms the DSS decision, then the targeted individual has the right to an appeal to the Superior Court pursuant to G.L.c. 30A. After a hearing on such an appeal,
[t]he court may affirm the decision of the [DSS], or remand the matter for further proceedings before the [DSS]; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed, if it determines that the substantial rights of any party may have been prejudiced because the [DSS] decision is—
(a) In violation of constitutional provisions; or
(b) In excess of the statutory authority or jurisdiction of the agency; or
(c) Based upon an error of law; or
(d) Made upon unlawful procedure; or
(e) Unsupported by substantial evidence; or
(f) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or
(g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.
*367 The court shall make the foregoing determinations upon consideration of the entire record, or such portions of the record as may be cited by the parties. The court shall give due weight to the experience, technical competence, and specialized knowledge of the [DSS], as well as to the discretionary authority conferred upon it.
G.L.c. 30A, §14(7).
In reviewing a DSS decision on appeal, this Court is confined to the administrative record unless procedural irregularities are alleged. G.L.c. 30A, §14(5). The Court also is required to give due weight to an agency’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. G.L.c. 30A, §14(7); Lisbon v. Contributory Retirement App. Bd., 41 Mass.App.Ct. 246, 257 (1996). The Court may not substitute its own judgment for that of the agency, “even though the court would justifiably have made a different choice had the matter been before it de novo.” South Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm’n., 386 Mass. 414, 420 (1982). Nor may the court disturb the credibility determinations of the hearing officer or her weighing of the evidence. Guarino v. Director of the Division of Employment Security, 393 Mass. 89, 92 (1984). Nevertheless, in determining whether the DSS decision rests upon substantial evidence, the court is
not required to affirm the [DSS] merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. [The Court’s] determination must be made “upon consideration of the entire record.” . . . “The sub-stantiality of evidence must take into account whatever in the record fairly detracts from its weight.”
Edward E. v. Department of Social Services, 42 Mass.App.Ct. 478, 480-81 (1997). While hearsay can form a permissible basis for an agency’s decision, that hearsay must be “reliable.” Id. at 480.
4. DISCUSSION
Minnehan, relying on G.L.c. 30A, §14(7){c), (d), (e), (g), claims that the DSS decision to support the §51A report and the decision to list him in the Registry were: (a) based upon error of law, and/or (b) made upon unlawful procedure, and/or (c) unsupported by substantial evidence, and/or (d) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. He therefore urges the court to direct the DSS to issue a new decision in which the §51A report is not supported and to order DSS to remove his name from the Registry immediately.
On the face of it, the DSS record appears to contain substantial evidence of the claims J.C. ma le. After all, J.C. apparently made those claims to his mother and then repeated them during the course of a SAIN interview. As Minnehan points out, however, from beginning to end, the DSS investigation was aimed at, and relied upon, information designed to “support” J.C.’s allegations and failed to explore or overlooked contraiy information. The hearing was little better and, for information adverse to plaintiff, often relied on conclusory, sometimes totem-pole hearsay. Those problems were compounded by the regulatory allocation of the burden of proof. Brief exploration of each of those three areas reveals the problems this record presents.
A. THE INVESTIGATION
As stated, DSS’s investigation, in a variety of fundamental ways, ignored or discounted information that tended to undercut, or at least place in context, the allegations J.C. had made with respect to Minnehan. In the first place, those allegations were not the first that J.C. had made regarding physical abuse by an adult. On the contrary, he had made a series of prior allegations against his mother Joan’s boyfriend, albeit allegations concerning physical, not sexual, abuse. Indeed, according to the DSS investigator’s account of observations made by Robertson, one of J.C.’s therapists, “[J.C.] does have a history of accusing mom’s boyfriend of physical abuse. This usually happens when the boyfriend has set limits with him.” R. 18.
DSS investigated those accusations and found them “unsupported.” Tr. 14. The DSS investigator, however, did not examine the DSS records to determine why they were unsupported, i.e., whether they were found by the investigator not to be credible or whether the “not supported” decision rested on more technical grounds.
Second, the DSS investigator did not examine J.C.’s allegations that plaintiff was performing similar sexual acts on another boy whom J.C. identified during his disclosures to Joan. At the hearing, the DSS investigator stated that she had not checked on those allegations because the other boy was in some program run by the YMCA and she had no authority to call the YMCA as part of her investigation. Moreover, she said she was not investigating the other boy. Tr. 52-54. That explanation made absolutely no sense and overlooked completely the credibility enhancing or detracting impact that corroboration or rejection of J.C.’s accounts of Minnehan’s alleged interactions with the other boy would have had.
Third, although J.C. reported performance by Minnehan of anal intercourse, the record does not suggest that the DSS investigator made any effort to have a physical examination conducted to determine whether or not there was any physical evidence consistent or inconsistent with that kind of an allegation.
Fourth, although J.C. had had at least four psychiatric hospitalizations during the previous two years, the DSS investigation did not include any examination of those hospital records or any inquiry of hospital staff members with respect to any propensity J.C. may *368 have had with respect to fabrication. This is not to say that the records would have revealed a propensity to fabricate. But J.C. had been diagnosed with depression and “oppositional defiant behavior.” R. 18, Tr. 20. “Oppositional defiant behavior” is
A pattern of negativistic, hostile, and defiant behavior lasting at least 6 months, during which four (or more) of the following are present: (1) often loses temper!;] (2) often argues with adults!;] (3) often actively defies or refuses to comply with adults’ requests or rules!;] (4) often deliberately annoys people!;] (5) often blames others for his or her mistakes or misbehavior!;] (6) is often touchy or easily annoyed by others!;] (7) is often angiy and resentful!;] (8) is often spiteful or vindictive.
American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (IV), Diagnostic Criteria 313.81 (1994). Thus there was some reason to investigate to determine whether there was, or might be, a causal connection between the allegations J.C. had made and the difficult illness from which he suffered.
Fifth, the DSS investigators failed to talk to Minnehan before reaching their conclusions and ordering that his name be placed in the Registry. R. 16, 25, 26. Then, having talked with him[5] and having received from him additional information, they did nothing to follow up on that information. This was no technical omission, no mere failure to neatly tie a few loose ends. Instead, Minnehan’s account of the context in which J.C. made the disclosures, considered against the backdrop of the other facts the record contained, surely would have provided an investigator interested in ferreting out the truth with grounds for further investigation.
When finally contacted by the DSS investigator, Minnehan said that J.C. had made the allegations on a day that can only be described as filled with traumatic interactions between Minnehan and J.C. As Minnehan described the day, he had plans to go to dinner with J.C., Joan and Joan’s boyfriend to celebrate Minnehan’s birthday. Minnehan arrived at J.C.’s house in his pick-up truck and found J.C. waiting for him in the driveway with his bicycle. As Minnehan stopped, J.C. placed his bicycle in the back of the truck. He then told Minnehan that he wanted to ride with him in the truck to dinner and then, after dinner, ride bicycles with him. J.C., however, had to be back at the Children’s Connection facility where he was residing after dinner and was not going to have enough time to ride bicycles. Minnehan explained that to J.C. and also told him that all four were going to ride to dinner together. J.C. became upset when Minnehan told him those things.
The four people ultimately got into Joan’s boyfriend’s car and drove to the boyfriend’s house where they stopped to get some money with which to pay for dinner. When they arrived at the boyfriend’s house, J.C., who apparently had been there before, wanted Minnehan to play darts with him on the dart board the boyfriend kept in his basement. Minnehan explained to J.C. that they had just stopped to get money and that there was not enough time to play darts. J.C. became angry and ran to the basement, grabbed the dart board and brought it upstairs. He propped the board up against a window and began to throw darts at it. Minnehan told J.C. not to throw darts at the dart board in that position because he might break the window. J.C. refused to stop and threw a dart that broke a window. J.C. then grabbed the dart board and tried to run to the basement to hide it before Joan’s boyfriend could see the damage. At that point, Minnehan told J.C. that he had to tell the boyfriend what he had done. J.C. refused to do so. Minnehan and J.C. then went back and forth over J.C.’s obligation to tell what he had done and J.C. persisted in his refusal. J.C. began to get angry. At some point in the dialogue, Minnehan called J.C. a “baby” because he would not take responsibility for what he had done and that made J.C. even more angry, hostile and withdrawn than he had been before.
Ultimately Joan and the boyfriend, money in hand, got back in the front seats of the car. Minnehan and J.C. got in back. J.C. was withdrawn, angry and red-faced. He refused to buckle his seat belt when told by the boyfriend to do so. The boyfriend then refused to move the car until J.C. buckled the seat belt. According to Minnehan, J.C. got even angrier and more withdrawn. Ultimately, after the impasse had persisted for some time, Minnehan told J.C. to buckle his seat belt or the car could not leave and there would be no dinner. J.C. continued his refusal. Minnehan told J.C. that he was going to buckle J.C.’s seat belt if J.C. did not. He reached across J.C. for the seat belt and J.C. grabbed his arm and told him to stop. Minnehan complied. All four people then again sat in the car with J.C. refusing to do anything.
At that point, Minnehan said that he had had enough and asked to be taken home. Upon hearing that, J.C. jumped out of the car, picked up rocks and started throwing them at the boyfriend’s house. He then ran into the boyfriend’s back yard where he continued to throw rocks at the house. Joan got out of the car and ran after J.C. Minnehan again told the boyfriend that he wanted to go home. The boyfriend then drove him back to Joan’s house so that he could retrieve his truck. Joan stayed in the boyfriend’s back yard trying to regain control of J.C. J.C. made the allegations regarding Minnehan that night and the following day. R. 19-21, Tr. 39-44.
There is no indication that any of that detail was known to the First Investigator or to those on whom she relied for opinions regarding the accuracy of J.C.’s allegations.[6] Although the record reflects a brief discussion between Joan and the First Investigator on the day of the SAIN interview, R. 23, none of the detail *369 related by Minnehan was explored in that discussion nor was there any indication that the investigator explored with Joan the underlying details regarding the manner in which or the context in which J.C. had made his allegations. Likewise, there is no suggestion in the record anywhere that anyone attempted to contact Joan after speaking to Minnehan in order to determine whether she corroborated his account of the day’s activities. These omissions appear on a record which, as stated, contains a histoiy of J.C.’s “unsupported” allegations of physical abuse against an adult in response to the adult’s efforts to “set limits” on J.C.’s behavior.
B. THE HEARING
As stated earlier, all of the testimony adverse to Minnehan at the hearing was presented by yay of hearsay. The hearsay, however, went far beyond recitations of primary fact. For example, the first investigator testified about a discussion she had had with Shaw, the Director of the Children’s Connection. Shaw described an incident in which J.C. had had plans to go on a camping trip with Minnehan and others. J.C. had been engaging in what the investigator characterized as “outrageous” behavior during the course of the day before the trip. At some point, Shaw contacted Joan to suggest the trip be canceled because J.C.’s behavior was out of control. The investigator testified that Shaw said that J.C. calmed down when informed that the trip was canceled and that he did so because he was “relieved.” Tr. 6. The investigator’s report, which was introduced at the hearing, went further and stated that Shaw told the investigator that J.C. was “relieved that he didn’t have to go on the camping trip.” R. 18. The quoted phrase is underlined, presumably by the hearing examiner, and is paraphrased in §9 of her decision.[7]
Nevertheless, there is no suggestion whatsoever anyplace in the record regarding the basis for Shaw’s conclusion that J.C. was relieved or what he was relieved about or what inferences should be drawn from his alleged relief. Again, this is no mere technicality. Minnehan, who testified that he — not Shaw or Joan — told J.C. he could not go on the trip on the night he was scheduled to go, also testified about an earlier skiing trip that had ended in an extremely stressful fashion for J.C. Tr. 31-33. Minnehan’s testimony in that regard was supported by the testimony of two other adult witnesses who had been with him on the trip. Tr. 60-61. This occurred before Shaw came in contact with J.C. and there is no suggestion in the record that she knew anything about it or took it into account in any fashion in making her alleged diagnosis about J.C.’s relief when he learned he would not be going on the trip.
The investigator also testified about her conversation with Robertson, J.C.’s therapist for approximately two months at the Children’s Connection. The investigator testified that Robertson "felt that [J.C.’s allegations were] very credible [and] that when, in retrospect, when they looked at the logs and looked at the contact that [J.C.] had with Mr. Minnehan it equated to behavior that was out of control.” Tr. 7. Continuing, the investigator testified that Robertson said that J.C. “does have a histoiy of accusing his mother’s boyfriend of physical abuse but that was typically when he was being punished — when the boyfriend would try to punish him. But she felt certain that in this instance that the disclosure was credible.” Id. The investigative report submitted at the hearing says as follows: “Ms. Robertson stated that in retrospect they have been able to connect [J.C.’s negative behavior with the contact he had with [Minnehan]. Investigator asked about [J.C.’s] reliability. She stated that he does have a histoiy of accusing mom’s boyfriend of physical abuse. This usually happens when the boyfriend has set limits with him. She stated that she feels that [J.C.] is credible with this disclosure.” R. 18. The quoted portions of the report bear various check marks and the handwritten phrase “does not say allegations were false,” both of which apparently were placed on the report by the Hearing Officer.
The basis on which Robertson was allegedly able to equate J.C.’s behavior with his contactwith Minnehan is not disclosed on the record[8] and, inferentially at least, is inconsistent with the observations Joan had made of J.C.’s contacts with Minnehan. Indeed, when the subject of Robertson’s evaluation arose at the hearing, it did so in the following context:
HEARING OFFICER: . . . First of all why don’t we go over what . . . the therapist, Rita Robertson, told you that the child was credible based on that she could, and I just want to be clear I understand it, that she could match when he was seeing Mr. Minnehan with the child’s behavioral changes.[9]
[INVESTIGATOR]: She (inaudible) [J.C.’si negative behavior with contact with Mr. Minnehan.
HEARING OFFICER: And you said that his negative behavior was behavior that was out of control. Can you just describe that a little more to me, what kind of behavior he would exhibit?
[INVESTIGATOR]: I don’t recall what the exact behaviors were. He needed to be restrained — he had gotten out of a car at one point — taking off — behavior that warrants restraints.[10]
Tr. 13-14. That is the sum and substance of the investigator’s recollection of any facts Robertson had given her. Manifestly, nothing in that recitation of facts supports an inference of anything.
Beyond that, however, there is no suggestion anywhere in the record that anyone had told Robertson of the events leading up to J.C.’s disclosures or that those disclosures had come on the heels of several instances, one right after the other, in which Minnehan had tried to “set limits” with J.C. and J.C. *370 had manifestly reacted to his effort in an antagonistic manner.
Finally, the basis upon which Robertson was able to dismiss, at least inferentially, the allegations of physical abuse J.C. made against Joan’s boyfriend while crediting the allegation J.C. made against Minnehan is by no means clear from anything the record contains.
Despite all of that, the hearing examiner dismissed Robertson’s dismissal of [J.C.’s] physical abuse claims by saying that “[the first investigator] said that a DSS record check showed that [J.C.] made prior allegations of physical abuse by his mother’s boyfriend which were screened-out[11] by the Department. However, there is no information that the allegations were screened-out because they were falsely made by [J.C.].” R.6. The hearing examiner then relied on Robertson’s conclusion that J.C.’s allegations regarding Minnehan were credible in §11 of her factual findings and heavily relied on that conclusion in her own conclusions. R.5A, 7. In other words, the examiner chose not to rely on Robertson’s hearsay statements of apparent disbelief of J.C.’s claims regarding Joan’s boyfriend but did rely on her hearsay statements of belief of J.C.’s claims about Minnehan.
On another subject, the hearing examiner stated in her findings that Joan told the First Investigator that Joan believed J.C.’s statements were true. R.5A. In fact, the First Investigator gave such testimony in response to a leading question the hearing examiner posed to her. Tr. 15. However, the First Investigator’s report — a report in which she was careful to note both her own belief in J.C.’s credibility and everyone else’s — contains no reference whatsoever to any statement by Joan that she believed that J.C.’s allegations were true.
In addition, however, the record contains two letters from Joan that Minnehan introduced during the course of the hearing. In the first Joan says “[p]lease let it be known that [Minnehan] did not force my son [J.C.] to have sexual contact with him, that he did not use or threaten to use, violence in any form to harm my son [J.C.]. I believe that these charges should be removed from [Minnehan’s] record.” R.29. When Minnehan introduced that letter at the hearing, the hearing examiner immediately stated “[s]he’s not saying that what her son said happened didn’t happen. That’s not what she’s saying here.” Tr. 2-7. The Hearing Officer then asked Minnehan whether Joan had said what she meant by what she wrote. To that, Minnehan responded “I was under the impression that what she meant by that was that she did not feel that I sexually abused [J.C.].” Id. The Hearing Officer responded “[o]kay that’s not how I read it.”[12] Id.
After the hearing concluded, Minnehan obtained another letter from Joan, this one notarized, in which she stated as follows:
It has been brought to my attention that there have been some questions concerning the validity of a letter I submitted for [Minnehan] regarding the charges of sexual abuse of my son [J.C.]. Since these allegations first surfaced in the summer of 1997, additional information has surfaced that prompted my request that these allegations be removed from [Minnehan’s] record. I am resubmitting this letter, which I will have notarized, with my own free will, and with the safety and welfare of the children in our community at heart.
R. 31.
The examiner mentioned the first letter, but not the second, in her findings, without comment. R. 6. Notwithstanding those letters, however, she found that Joan believed J.C.’s statements about Minnehan.
Finally, the heart of the hearing examiner’s decision to affirm the DSS determination is contained in the following three paragraphs from her conclusions:
The reported child made written/oral disclosures of being sexually abused by [Minnehan]. The acts described include mutual oral sex and anal penetration by [Minnehan] in exchange for money. The child gave details of the abuse, including how old he was when it occurred and where the abuse took place. The child was seen as credible, and the child’s therapist linked his acting out behaviors with contact by [Minnehan]. This information meets the low threshold of reasonable basis to believe that [Minnehan], in the role as caretaker, committed nonaccidental acts which constitute sexual offenses under the laws of the Commonwealth, and which meet the Department’s definition of abuse.
Listing [Minnehan] as an alleged perpetrator of sexual abuse was done in accordance with Department regulations as the report was supported and referred to the District Attorney, and the child’s credible disclosures naming [Minnehan] as the perpetrator, along with observable behavioral indicators which the child’s therapist linked to contact with [Minnehan], constitutes substantial evidence indicating that [Minnehan] Appellant was responsible for the abuse.
[Minnehan] presented testimony and written statements from employers, including the YMCA, and others who had positive things to say about [Minnehan’s] interaction with the reported child/other children and who disbelieved the allegations because of [Minnehan’s] personality and character. [Minnehan] also submitted a letter from the reported child’s mother which states that the appellant did not force her son to have sex with him. This information is not convincing and, when weighed against the multiple, credible disclosures of the child, fails to prove that the Department’s decision was not in conformity with its regulations and should be reversed.
R. 7-8.
*371 In other words, because J.C. made the allegations and because a psychotherapist stated she believed the allegations without disclosing the basis for her belief and without disclosing why she apparently rejected claims J.C. had made regarding physical abuse by Joan’s boyfriend and without disclosing whether she was aware that J.C.’s allegations, like those he had made against the boyfriend, had come on the heels of Minnehan’s attempt to “set limits” for J.C. and although J.C. had been diagnosed as suffering from a behavioral disorder that included spiteful vindictiveness, see p.12, supra, J.C.’s claims met “the low threshold of reasonable basis to believe” they were true and Minnehan failed to carry his burden of proving that they were not.
C. THE BURDEN OF PROOF
The foregoing discussion of the investigation and of the hearing highlights the functional role the burden of proof plays in the regulatory scheme. As stated, in an appeal of a DSS decision to support a §51A report or to list an alleged perpetrator in the Registry, 110 C.M.R. §10.23 places the burden of proof on the appellant:
To prevail, the aggrieved party must show by a preponderance of the evidence that (1) the Department’s or provider’s decision was not in conformity with the Department’s policies and/or regulations and resulted in substantial prejudice to the aggrieved party; (2) that the Department’s or provider’s procedural actions were not in conformity with the Department’s policies, regulations, or procedures and resulted in substantial prejudice to the aggrieved party; or (3) if there is no applicable policy, regulation, or procedure, that the Department or provider acted without a reasonable basis or in an unreasonable manner which resulted in substantial prejudice to the aggrieved party. . . .
That allocation is not inconsistent with similar allocations in other contexts. See Richard W. Bishop, Prima Facie Case: Proof & Defense, 17C Mass. Prac. §58.4, at 14 n.7; Craven v. State Ethics Comm’n, 390 Mass. 191, 200 (1983); Duato v. Comm’r of Public Welfare, 359 Mass. 635, 640 (1971); Almeida Bus Lines, Inc. v. Dep’t of Public Utilities, 348 Mass. 331, 342 (1965); Merisme v. Bd. of App. on Motor Vehicle Liability Policies & Bonds, 27 Mass.App.Ct. 470, 474 (1989); Faith Assembly of God of S. Dennis & Hyannis, Inc. v. State Bldg. Code Comm’n., 11 Mass.App.Ct. 333, 334-35 (1981). Cf. 5 U.S.C. §556(d) (federal APA ordinarily allocates burden of proof to proponents of an order or rule); Care & Protection of Leo, 38 Mass.App.Ct. 237, 242-43 (1995) (Appeals Court rejected plaintiffs contention that DSS should cany the burden of production of witnesses in a care and protection proceeding).
Clearly, the Commonwealth has the power to regulate the procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, “unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.” Speiser v. Randall, 357 U.S. 513, 523 (1958), quoting Snyder v. Massachusetts, 291 U.S. 97, 105 (1934).[13] But
the outcome of a lawsuit — and hence the vindication of legal rights — depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights.
Speiser, 357 U.S. at 520-21. For that reason, the burden of proof ordinarily cannot be allocated to the defendants in a criminal case. Id. at 524. See also Richard W. Bishop, Prima Facie Case: Proof & Defense, 17B Mass. Prac. §52.61, at 281-82, citing Commonwealth v. Briggs, 22 Mass. 429, 431 (1827). Likewise, the importance of the decision may fix the location of the burden of proof in civil cases as well. Speiser, 357 U.S. at 524, citing Western & A.R.R. v. Henderson, 279 U.S. 639, 644 (1929); New York Times Co. v. Sullivan, 376 U.S. 254, 278-79 (1964). Allocation of the burden, in the last analysis, determines who bears the risk of mistaken factfinding. Speiser, 357 U.S. at 526. See Levine, Do Standards of Proof Affect Decision Making in Child Protection Investigations?, 22 Law & Human Behavior 341, 341 (1998) (“Lawmakers have decided that it is more important to try to protect a child by risking a false-positive error than to avoid the erroneous determination that someone has maltreated a child”).
Here, several important interests are at stake.[14] First, “although the procedure [following submission of] a §51A report is classified nominally as civil, it verges toward the criminal, and especially so in regard to the registry.” Covell v. Dep’t of Social Serv’s, 42 Mass.App.Ct. 427, 432 (1997). See also Arnone v. Comm’r of the Dep’t of Social Serv’s, 43 Mass.App.Ct. 33, 36 (1997) (“the agency determination has overtones of a finding of criminal conduct”); A.Y. v. Commonwealth, 641 A.2d 1148, 1152 (Penn. 1994) (although an action to expunge plaintiffs name from the registry is not a criminal proceeding, it “is of the most serious nature”).
Second, whether or not the proceedings are quasi-criminal, the Appeals Court has stated that a decision to list a person in the Registry is “a decision ... of more than ordinary gravity in that it places a permanent mark on a person.” Edward E. v. Dep’t of Social Serv’s, 42 Mass.App.Ct. 478, 487 (1997).[15] See also Arnone, supra, 43 Mass.App.Ct. at 37 (a Registry *372 listing is “likely to cast a shadow over the person concerned indefinitely”). In that regard, the Court noted that 110 C.M.R. §4.38(4) permits the DSS Commissioner to allow anyone he or she chooses to access the Registry without notice to the listed alleged perpetrators. Edward E., 42 Mass.App.Ct. at 487 n.11.[16] The Registry process thus implicates at least some of the interests that have led the Supreme Judicial Court to conclude that due process requires a hearing with the burden of proof on the Commonwealth before one can be required to register as a sex-offender. Doe, Sex Offender Registry Bd. No. 972 v. Sex Offender Registry Bd., 428 Mass. 90, 98-104 (1998); Doe v. Attorney General, 426 Mass. 136, 143-44 (1997).[17]
Third, the majority of courts in other jurisdictions that have considered whether listing an alleged perpetrator in a registry implicates due process interests have answered in the affirmative: Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994); Sims v. State Dep't of Public Welfare, 438 F.Sup. 1179, 1192 (S.D.Tex. 1977), rev’d on other grounds sub nom. Moore v. Sims, 442 U.S. 415 (1979); Lee TT. v. Dowling, 664 N.E.2d 1243, 1249-50 (N.Y. 1996); State v. Jackson, 496 S.E.2d 912, 915 (Ga. 1998); Cavaretta v. Dep’t of Children & Family Serv’s, 660 N.E.2d 250, 254 (Ill.App.Ct. 1996); N.J. Division of Youth & Family Serv’s v. M.R., 715 A.2d 308, 317-18 (N.J. Super. Ct. App. Div. 1998); In re allegations of Sexual Abuse at East Park High School, 714 A.2d 339, 347 (N.J. Super. Ct. App. Div. 1998). Contra Hodge v. Jones, 31 F.3d 157, 165 (4th Cir. 1994); Glasford v. N.Y. State Dep’t of Social Serv’s, 787 F.Sup. 384, 388 (S.D.N.Y. 1992); Arkansas Dep’t of Human Serv’s v. Heath, 848 S.W.2d 927, 929-31 (Ark. 1993); In re Physical Abuse at Blackacre Academy, 698 A.2d 1275, 1283-85 (N.J Super. Ct. App. Div. 1997); R. v. Commonwealth, 636 A.2d 142, 148-50 (Pa. 1994).[18]
Fourth, this Court is aware of no other state that utilizes a hearing or similar process for an appeal of a decision to list an alleged perpetrator in a registry in which the burden of proof falls on the alleged perpetrator. At least eight states explicitly provide that the government carries the burden of proof: Colo. Rev. Stat. §19-3-313(5.5)(b)(1); 325 Ill. Comp. Stat. 5/7.16; Ind. Code §31-33-19-2; Neb. Laws 28-723; N.Y. Soc. Serv. Law §422(8)(b)(ii); 23 Pa. Cons. Stat. §6341(c); S.D. Laws 26-8A-11; 33 Vt. Stat. Ann. §4916(h). See also J.M. v. Dep’t of Family Serv’s, 922 P.2d 219, 222 (Wyo. 1996) (interpreting Wyo. Stat. §§14-3-201 to 14-3-215); Nat’l Center on Child Abuse & Neglect, Model Child Protection Act §2I(i), quoted in Besharov, Putting Central Registers to Work: Using Modern Management Information Systems Improve Child Protective Services, 54 Chicago-Kent L. Rev. 687, 748-49 (1978).
Clearly, of course, there are weighty interests on the other side. No one can think for a moment that protecting children from the predations of adult caretakers is anything other than an interest of the highest order. The importance of that interest and its advancement, however, do not swallow up all else. In particular, neither the weight of that interest nor its importance justifies labeling individuals as “child abusers” without completing the kind of fair and precisely-focused inquiry commensurate with that label’s enormously destructive potential.
In the last analysis, this case illustrates the importance of the role played by the burden of proof. The regulatory threshold for DSS action is, as the hearing examiner correctly observed, low. For whatever reason, the DSS investigation in this case purported to achieve that low threshold by accentuating the incul-patory and overlooking or ignoring the exculpatory. The investigators accepted conclusory, judgmental information provided to them by others without pausing to consider the basis upon which those judgments rested or whether those who provided the judgments had access to all material facts on which to base a judgment. The hearing picked up where the investigators ended, once again accentuating the inculpatory and finding ways both to dismiss the exculpatory and to resolve all ambiguities against Minnehan.
Particularly when the burden of proof is on the alleged perpetrator, an investigatory system simply cannot produce fair results if those conducting the investigation blind themselves to areas pointing away from guilt and create a record consisting of whatever is minimally necessary to support the conclusion they propose. An investigatory system cannot produce fair results if the post-investigation hearing simply builds on the investigation’s skeletal outlines and accepts unthinkingly and uncritically the conclusory judgments supporting the investigators’ proposed outcome.
In the last analysis, it may well be that, for reasons this record amply illuminates, the due process clauses of the state and federal constitutions place on the DSS the burden of proving the correctness of their conclusions at the administrative level. Whether or not that is so, the Appeals Court has suggested that the concept of “substantial evidence” is sufficiently flexible to take account of the impact of the finding or judgment the evidence is offered to support. In Edward E. v. Department of Social Services, 42 Mass.App.Ct. 478, 487 (1997), the Court, in vacating a DSS judgment to list an individual in the Registry, stated as follows:
[W]e think the evidence upon which the department relied was so persistently encumbered by unreliability that it fails to have the character of substantiality which would support the department’s decision to place the father’s name on its registry of alleged perpetrators for a period of seventy-five years.
That flexible approach to the concept of “substantial evidence” puts teeth in the notion that the record must be evaluated by looking not only at what supports the conclusion the DSS reached but also at what *373 detracts from that conclusion. That flexible approach supports the notion that hearsay on which a serious decision is based must be hearsay of a “reliable” character. And that flexible approach is an appropriate tool to use in insuring that both the investigation and the hearing are societal instruments for determining the truth, not simply devices for insuring that labels stick. That flexible approach leads me to conclude that, on this record, the DSS decision was not supported by substantial evidence and must be vacated.
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter:
(1) Vacating the order entered by the Department of Social Services on August 17, 1998;
(2) Ordering the Department of Social Services to strike forthwith the name of plaintiff, Kevin Minnehan, from the Registry of alleged Perpetrators; and
(3) Ordering the Department of Social Services to notify forthwith any person, public or private, to whom it conveyed information of its August 17, 1998 decision that that decision has been vacated.

 110 C.M.R. §4.36 provides that
The Department shall pursuant to M.G.L.c. 18B, §7(b) create and maintain a Registry of Alleged Perpetrators as a component of the Central Registry maintained pursuant to M.G.L.c. 119, §51F.
G.L.c. 18B, §7(b), in turn, provides that
The commissioner [of the DSS] shall develop and implement a management information system which shall contain fiscal and personnel data, client data, and program data necessary for the ongoing administration of effective service delivery. Said information system shall include but not be limited to a service plan for each client, with provisions for periodic review thereof. The commissioner shall promulgate such rules and regulations as are deemed necessary to ensure the confidentiality of client data collected by the department.
Finally, G.L.c. 119, §51F provides, in material part, that
The [DSS] shall maintain a central registry of information sufficient to identify children whose names are reported pursuant to section fifty-one A or fifty-one B. Data and information relating to individual cases in the central registry shall be confidential and shall be made available only with the approval of the commissioner or upon court order.
No one here contends that the Registry is not authorized either by G.L.c. 18B, §7(b) or by c. 119, §51F.

 110 C.M.R 4.37 provides that
The name of the alleged perpetrator shall be added to the Registry of Alleged Perpetrators if: (1) the allegation of child abuse or neglect has been supported and referred to the District Attorney pursuant to M.G.L.c. 119, §51B(4) and (2) there is substantial evidence indicating that the alleged perpetrator was responsible for the abuse or neglect. Pursuant to M.G.L.c. 30A, §1(6) substanti'l evidence is defined as “such evidence as a reasonable mind might accept as adequate to support a conclusion.”
The name of the alleged perpetrator shall remain on the Registry of Alleged Perpetrators for 75 years or until the decision to list the name of the alleged perpetrator is reversed pursuant to 110 CMR 10.00 et seq., or by a court of competent jurisdiction.

 SAIN interviews are typically a step in the process used to determine whether a reported sexual assault will result in criminal proceedings. In this case, no criminal charges were preferred against Minnehan.

 The term “caretaker” is defined “broadly and inclusively to encompass any person who is, at the time [alleged in a report], entrusted with a degree of responsibility for the child [about whom the report is made].” 110 C.M.R. 2.00. There is no suggestion here that Minnehan was not a “caretaker” at the relevant time.

 Minnehan urges that it was unfair and inappropriate for DSS to assign his interview to the Second Investigator when the First Investigator had conducted the rest of the investigation, had opined in her report on her conclusions regarding J.C.’s credibility and had reported so freely on the credibility conclusions reached by others. Nothing requires the same investigator to conduct the entire investigation. It is difficult, however, to see how fairness and reliability are enhanced by dividing the work in this fashion, particularly when investigators are drawing conclusions about credibility. Moreover, there is no evidence in the record that the First Investigator ever read the Second Investigator’s report of the interview with Minnehan or that the Second Investigator ever read the First Investigator’s. Thus there is no evidence that any investigator ever looked at all of the evidence before — or even after — all of the evidence was gathered.

 The First Investigator’s report relies on the following account of the circumstances of the allegations the First Investigator obtained from Robertson, J.C.’s therapist at the Children’s Connection. Robertson told the First Investigator that J.C.
was home on the weekend, he was acting out. His mom had explained to him that if he didn’t start to behave that they would not be able to follow through with birthday plans they had to celebrate Mr. Minnehan’s birthday. They were planning on taking him out to eat that evening. His behavior continued to deteriorate and mom again said how can you do this. He’s been so good to you. And this is when [J.C.] broke down and said he hasn’t been as good as you think and made the disclosure to his mother about the sexual abuse.
Tr. 6-7.

 From this and other components of her decision, it is clear that the hearing examiner clearly relied on the investigative report and did not limit herself to the investigator’s hearing testimony.

 Indeed, the record does not reflect the number of times Minnehan had seen J.C. during the approximately two months Robertson had been his therapist.

 Up to that point, there had been no evidence that that is why Robertson believed that J.C. was credible. The First Investigator did not testify to that and her report does not say that.

 That cryptic account, of course, is consistent with the events of the evening Minnehan described. The record, however, does not suggest whether the First Investigator was referring to that occasion or to some other or even that she knew the occasion to which she was referring.

 Screening out" is a term of art indicating dismissal of allegations on their face. See 110 C.M.R. 4.21. There was no evidence that J.C.’s allegations were “screened out.” Instead, the evidence was that they were “unsupported.” Tr. 14. A finding that allegations are “unsupported,” like a finding that they are “supported,” comes after an investigation. 110 C.M.R. 4.32.

 There were other instances in which the hearing examiner manifested an almost visceral allegiance with the DSS investigator. Consider this exchange on the important subject of why the First Investigator had not interviewed Minnehan before completing her investigation:
HEARING OFFICER: So your question for the investigator is why were you interviewed after the investigation was completed?
[MINNEHAN]: I believe I know the answer.
HEARING OFFICER: Well why don’t you, first of all, hear what they have to say.
[MINNEHAN]: Right. Okay, sorry.
HEARING OFFICER: Who wants to address that?
[FIRST INVESTIGATOR]: I guess I will. All I can tell you that during the ten-day investigation that I had that piece of the interview with you was, what’s the word I’m looking for, delayed for lack of better words, because of case management issues with myself.
[MINNEHAN]: Sure.
[FIRST INVESTIGATOR]: The date is because of a computer date. The decision wasn’t actually made until after the, I mean, the final decision wasn't actually made until after you were interviewed. But that’s the way it goes into—
HEARING OFFICER: Okay, let me just clarify for the record, if you had, if there was an interview with an appellant and based on the interview you felt that there was no longer reasonable cause to believe that an incident of abuse occurred, you could have gone to your supervisor and asked that you be changed at that point
[FIRST INVESTIGATOR]: Absolutely.
HEARING OFFICER: Okay, all right. Why don’t you move onto your next question.
Tr. 21-22.
The first investigator was not the investigator who interviewed Minnehan. Her suggestion that the investigation was not actually completed until after Minnehan’s interview plainly contradicts the hand-written — not computer-generated — date she placed next to her signature on her own report. The remainder of her explanation descends into incoherence from which she was rescued by the hearing officer’s injection of steps she could have taken if the content of Minnehan’s interview had changed her mind. That explanation was offered by the hearing examiner without any basis in the record — anyplace—that the first investigator had ever read the second investigator’s report of her interview with Minnehan. Little about this exchange suggests impartiality. See generally Police Comm'r of Boston v. Municipal Court of West Roxbury, 368 Mass. 501, 507 (1975).

 Courts “have treated the procedural due process protections of the Massachusetts and the United States Constitutions identically.” Liability Investigative Fund Effort, Inc. v. Mass. Medical Professional Ins. Ass’n, 418 Mass. 436, 443 (1994). See also Massand v. Medical Professional Mut. Ins. Co., 420 Mass. 690, 693 n.4 (1995). But see Doe v. Attorney General, 426 Mass. 136, 144 n.8 (1997).

 DSS says, among other things, that no interests are at stake because, in the last analysis, all the DSS is doing by listing a person in the Registry or “supporting” an allegation of sexual abuse is maintaining a list of “suspects.” DSS Brief at 2-3. But the very fact of the administrative process — a process that purports to give an individual an opportunity to be heard and to present evidence — gives the DSS action an adjudicatory weight no list of “suspects” maintained by law enforcement agencies will ever have. As a consequence, if the DSS chooses to have adjudicatory proceedings, it must do so properly notwithstanding the possibility that it could carry out its mission without them.

 The punitive consequences of a listing in the Registry also appear to be unusually long-lived. Massachusetts retains founded reports in its Registry for 75 years. 110 C.M.R. §4.37. This Court is aware of no other state that specifies a retention period even half as long. Compare Conn. Agencies Regs. § 17a-101 -4(b) (2) (founded reports expunged seven years after child turns 18); Ind. Code §31-33-19-8 (founded reports expunged after twenty years); Iowa Code §235A.18 (founded reports expunged after ten years); Md. Code. Ann. Fam. Law §5-715(e) (founded reports expunged after seven years); Mich. Comp. Laws §722.627(6) (founded reports expunged after ten years, or ten years after child turns 18, whichever occurs later); Nev. Rev. Stat. §432.120 (founded reports expunged ten years after child turns 18). N.H. Rev. Stat. Ann. §169-C:35 (founded reports expunged after seven years); N.Y. Soc. Serv. Law §422(6) (founded reports expunged ten years after child turns 18); S.C. Code Ann. §20-7-650(J) (founded reports expunged after seven years).

 Reed v. Commonwealth, Essex No. 97-12111, slip op. at 8 (Oct. 27, 1998), on which the DSS relies, does not discuss the Commissioner's broad authority to allow access to Registry information. Moreover, the plaintiff in Reed had not been listed in the Registry.

 This regulatory scheme therefore is very different from the statutory scheme discussed by the Supreme Judicial Court in Vaccaro v. Vaccaro, 425 Mass. 153 (1997). Moreover, the Court’s reliance on Paul v. Davis, 424 U.S. 693, 711 (1976), for the proposition that governmental injury to reputation implicates no liberty interest unless that injury also alters some other right or status cannot possibly be read to suggest that such injury is inconsequential. Manifestly, it is not. See, e.g., Wooldridge v. Hickey, 45 Mass.App.Ct. 637, 638 (1998).

 However, R. appears to have been overruled implicitly by A.Y., 641 A.2d at 1152 and n.6, and Blackacre Academy appears to have been overruled implicitly by M.R., 715 A.2d at 317-18, and East Park High School, 714 A.2d at 347. In addition, all but Heath deal with statutes which specifically limit access to their registries, and do not incorporate a loophole akin to 110 C.M.R. §4.38(4) which allows anyone to access the Massachusetts Registry at the discretion of the Commissioner of DSS. Edward E., supra, 42 Mass.App.Ct. at 487 n.11.
In that regard, it is worth noting that some states have, like Massachusetts, delegated to an administrative official responsibility for identifying those individuals and entities who may have access to files in a central registry of child abuse reports. See, e.g., Nev. Rev. Stat. §432.120; N.H. Rev. Stat. Ann. §169-C:35; Tex. Fam. Code Ann. §261.002. Statutes in the majority of jurisdictions, however, typically identify specific entities that are allowed access to the central registry — including agencies with oversight of children and foster care and the adoption process, agencies with regulatory authority over child care providers, district attorneys and/or law-enforcement officers and governmental agencies that compile statistical information for studies of the extent and nature of child abuse in a particular region — but do not confirm discretion on administrative officials to add to that list. See, e.g., Ark. Code Ann. §12-12-506; Colo. Rev. Stat. § 19-1-307(2)(a)-(q); Conn. Gen. Stat. §17a-28; 325 Ill.Comp.Stat. §5/11.1; Ind. Code §31-33-17-6; Md. Ann. Code, Art. 88A, 6(b); Neb. Rev. Stat. §28-726; N.J. Stat. Ann. 9:6-8.10; N.Y. Soc. Serv. §422(4)(A)(a)-(v); 23 Pa. Cons. Stat. §6340; S.D. Codified Laws 26-8A-13; Vt. Stat. Ann. Tit. 33, §4916.