Ferrara, John S., J.
The plaintiff, Emilia Ibanez (“Ibanez”), filed a complaint in the Superior Court pursuant to G.L.c. 30A, §14, challenging an order of the Fair Hearing Office (the “Office”) of the Department of Children and Families (the “Department”) affirming the Department’s decision to “support” a report that she physically abused and neglected her foster son Jerry F. (“Jerry”), neglected her foster daughter Lillian F. (“Lillian”), and neglected her two adopted sons, Jayden Ibanez (“Jayden”) and Benjamin Ibanez (“Benjamin”). The Department “supports” a report when it is persuaded that there is reasonable cause to believe that an incident of abuse or neglect by a caretaker occurred. Ibanez argues that she did not abuse or neglect any of the children. She has now moved for a judgment on the pleadings. After a review of the proceedings and the record, the plaintiffs motion is ALLOWED.
Background
The following facts are taken from the administrative record.
At the time of the incident in question, Ibanez was the adoptive parent of Jayden and Benjamin Ibanez, and was the foster parent for three siblings, Lillian, Jamie, and Jerry. She served as caretaker for the five children, and was the only adult living in the house with them. Jerry had been placed with Ibanez in May 2010. He had a history of behavipral issues including aggressive behavior toward other children.
On Monday, November 15, 2010, the Department received allegations concerning an incident involving Jerry that had occurred at Ibanez’s home the previous day, November 14, 2010. Jerry’s On-Going Social Worker, Sherri Fleck (“Fleck”), had learned (perhaps from Ms. Ibanez) that Jerry had had a bad weekend. It was reported that Jerry had a tantrum and had broken items. Ms. Fleck called Jerry’s school and asked that someone check on him. His teacher observed that Jerry looked sad. When she asked him what was wrong, he would not talk to her about it, but agreed to write it down. He did so. Jerry wrote about an incident alleged to have occurred the day before. Jerry’s letter is not part of the Administrative Record, but it is reported that he wrote that he had been mad and that Ms. Ibanez had grabbed his arms and squeezed, and she had slammed down his “play station," an electronic game. Jerry wrote that he was hurt and had bruises on his arms. A school nurse saw Jerry and purportedly documented that he had some bruising bilaterally on the backs of his upper arms.
Investigator Maria Figueroa (“Figueroa”) was then assigned to the case. She traveled to the school and met with Jerry, his sister, Lillian, and the social worker, Fleck. Figueroa and another investigator also spoke with Jayden, Benjamin, and Ibanez.
*70 The Department determined that Ibanez had physically abused Jerry and had neglected Jerry, Lilly, Jamie, Jayden, and Benjamin. In support of its finding that Ibanez had neglected Lillian, Jamie, Jayden, and Benjamin, the Department noted that all of the children had been in the house during the incident and that witnessing excessive physical discipline is emotionally damaging to young children. Ibanez appealed the Department’s decision to the Office. The Office held a hearing on March 31, 2011.
From the record before it, the Office ultimately determined that, on November 14, 2010, there was an altercation between Jerry and Jayden, who was younger and much smaller than Jerry. Jerry began throwing things and broke a toy bin. Ibanez heard the commotion and went upstairs. She grabbed Jerry by his arms, squeezed them, and told Jerry that he “wasn’t going to act like that” in her house. She testified at the hearing that she was concerned for the safety of the other children who were smaller than Jerry. She told Jerry that he “had to pick up the stuff.” At some point, Ms. Ibanez became angry and frustrated with Jerry and either purposefully or accidentally damaged his play station game. The system was still operational, however, because the pieces could be snapped back together. Lillian, Jayden, and Benjamin witnessed the incident. Jamie was asleep in another room.
In his November 15, 2010, meeting with Fleck and Figueroa, Jerry claimed that Ibanez treated him differently than the other children, called him names like “stupid” and “baby,” and told him that he “would listen, if there was a Twinkie in front of [him].”
Following the incident, Jerry was left with bruises on his upper arms, which lasted for several days. He reported that he was sore, and had a difficult time cleaning up the mess after the incident. The school nurse also noticed scratches on Jerry’s back which he had not reported. Dr. Moles, who examined Jerry during the investigation, believed that the scratches could have been related to the incident, but may also have been acquired normally by an active ten-year-old boy.
Ibanez was interviewed about the incident on November 15, 2010, and testified at the Office’s hearing on March 31, 2011. Ibanez explained that the incident began on Saturday, November 13, 2010. Ibanez witnessed Jerry and Jayden fighting on the stairs. Jerry held Jayden’s head on the carpeted steps, leaving an imprint on his forehead. Ibanez told them both to go to bed, and informed Jerry that the next day he would have to write “I will learn to keep my hands to myself’ on a sheet of paper. The next morning, Jerry showed Ibanez that he had already started writing. Ibanez told Jerry he could take a break to have breakfast, and would then have to return to finish. At that point, Jerry became angry and began knocking pictures off the walls, breaking toys, and yelling. Ibanez went in front of Jerry and grabbed him to get him to stop. Jerry weighed one-hundred-thirty pounds, and was much bigger than the other children, who were in the room with him at the time. Ibanez said that she was concerned with protecting the other children. She admitted that she picked up Jerry’s video game system and told him “here, break something of your own.” She stated that when she went to turn around, her hand hit the door and the system fell to the floor and broke apart. She maintained that she did not deliberately throw the system. Ibanez denied pushing Jerry, scratching him, or leaving bruises. She believed that the bruises may have resulted from Jerry’s fight with Jayden or his subsequent outburst, and that the scratches likely came from Jerry himself, as he suffered from eczema. She also denied that she treated him any differently than the other children. She was only concerned that Jerry was much bigger than the other children and had to be careful with them. Ibanez denied calling Jerry names or making the statements to Jerry that he had attributed to her.
Following the hearing, the Office issued an order affirming the Department’s decision to support the reports that Ibanez physically abused Jerry and neglected Jerry, Lillian, Benjamin, and Jayden. The Office reversed the Department’s decision to support the report that Ibanez neglected Jaime, because the evidence demonstrated that Jamie was asleep in another room at the time of the incident, and had not witnessed it.
Discussion
A. Standard of Review
Under G.L.c. 30A, §14(7), a reviewing court may reverse, remand, or modify an agency decision if “the substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law or on unlawful procedure, is arbitrary and capricious, or is unwarranted by facts found by the agency supported by substantial evidence. The party seeking review bears the burden of demonstrating the invalidity of the agency’s decision. Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989).
“In general, we give ‘substantial deference’ to an agency’s interpretation of those statutes which it is charged with enforcing.” Providence & Worcester R.R. v. Energy Facilities Siting Bd., 453 Mass. 135, 141 (2009). Deference is particularly appropriate when the statute in question explicitly grants broad rule-making authority to the agency, see Goldberg v. Board of Health of Granby, 444 Mass. 627, 634 (2005), contains an ambiguity or gap, see Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm., 457 Mass. 748, 759 (2010), or broadly sets out a legislative policy that must be interpreted by the agency. See Massachusetts Org. of State Eng’rs & Scientists v. Labor Relations Comm’n, 389 Mass. 920, 924 (1983), quoting School Comm. of Springfield v. Board of Educ., 362 Mass. 417, *71 442 (1972). We also must give deference to the agency’s “experience, technical competence, and specialized knowledge,” where relevant. G.L.c. 30A, §14(7). See, e.g., Alliance to Protect Nantucket Sound, Inc. v. Department of Pub. Utils., 461 Mass. 166, 178 (2011), quoting Cambridge v. Department of Telecomm. & Energy, 449 Mass. 868, 875 (2007) (deferring to agency’s interpretation of undefined statutory term in case involving “complex statutory and regulatory framework”); Springfield, v. Department of Telecomm. & Cable, 457 Mass. 562, 568 (2010) (“Because of its specialized knowledge, technical competence, and experience in the cable television industry, the department possesses the expertise to determine whether the language in question constitutes a term of art in that industry”).
B. Analysis
In the present case, the Office’s determination that Ibanez had abused Jerry was arbitrary and capricious. “A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support.” Cambridge v. Civil Serv. Comm’n, 43 Mass.App.Ct. 300, 303 (1997). Here, the Office’s definition of “abuse” was so broad as to encompass behaviors that are not abusive, and the finding that Ms. Ibanez’s conduct in holding Jerry’s arms and causing bruising was abuse is not one that most reasonable persons would support.
The Office defined “abuse” as “the non-accidental commission of any act by a caretaker upon a child under age 18 which causes, or creates a substantial risk ofl,] physical or emotional injury.” The Office further noted that “physical injury means death; or fracture of a bone, a subdural hematoma, burns, impairment of any organ and any other such non-trivial injury; or soft tissue swelling or skin bruising depending upon such factors as the child’s age, circumstances under which the injury occurred, and the number and location of bruises; or addiction to drugs at birth; or failure to thrive.” With regard to the present case, the Office stated that “(p)hysical injury, as defined above, constitutes skin bruising as in the instant case.” The Office thus appears to have made no effort to make use of the “physical injury” definition in context. As the definition itself acknowledges, not every incidence of bruising can constitute abuse. For example, a parent may need to grab hold of a young child to prevent him or her from running into the street. Such an action may be painful for the child, and may cause a “physical injury.” However, no rational person would consider such an action to be abusive. Rather, the minor injury would simply be an unfortunate consequence of the necessary action to protect the child and prevent a more serious injury.
The Office appears to have failed to take account of such mitigating circumstances in this case. The Office itself found that Jerry had already hurt Jayden and was in the process of throwing and breaking toys when Ibanez grabbed him. The Office also knew that Jerry was much bigger than the other children in the house, and thus could seriously hurt them during such a temper tantrum. While Ibanez likely did cause bruising on Jerry’s arms her actions must be understood in context. There were several other smaller, younger children in the room with Jerry, and he had already harmed one of them. His throwing of items created a risk of harm to all present. Rather than factor these details into its final determination, the Office simply concluded that “physical injury . . . constitutes skin bruising.” Such a broad understanding of the definition of “physical injury” clearly “lacks any rational explanation that reasonable persons might support.” Cambridge, 43 Mass.App.Ct. at 303. It would leave caretakers virtually unable to use any physical force to restrain children in order to protect the child or others from greater harm. As a result, the Office’s order affirming the Department’s decision to support the report for physical abuse of Jerry is arbitrary and capricious, and must be overturned.
The decision to support the report for neglect of Jerry, Lillian, Jayden, and Benjamin was based upon the incident between Ibanez and Jerry. The Office found that, because the four children had witnessed the incident, Ibanez had “fail[ed] to ensure their emotional stability and growth and therefore neglected them.” The Office cited a number of cases for its proposition that “courts have repeatedly recognized that witnessing domestic violence has a profound impact on the development and well-being of children.” However, these cases involved far more serious incidents of domestic violence than an adult simply grabbing hold of a child. For example, in Custody of Vaughn, two children witnessed their mother’s companion “fly into rages” and inflict injuries on their mother on numerous occasions. 422 Mass. 590, 591 (1996). Once, the man caused their mother to lose consciousness and be sent to the hospital. Id. In Adoption of Ramon, a father abused alcohol and marijuana, would often become violent, caused the mother to fear for her safety, and was arrested for attacking the mother. 41 Mass.App.Ct. 709, 710 (1996). The couple’s child witnessed these incidents “on five or six occasions.” Id. at 713. The Office’s conclusion that Ibanez grabbing Jerry’s arm to prevent him from causing harm to himself or another child was “domestic violence” on par with the incidents in Vaughn and Ramon is again arbitrary and capricious. While viewing domestic violence may certainly harm a child’s growth and emotional stability, no rational person could agree that merely grabbing a child’s arm in front of several other children could have “a profound impact on the development and well-being” of the witnesses. The Office’s orders regarding the reports of neglect must thus be overturned as well.
Even if the Office’s order had not been arbitrary and capricious, the Office still lacked substantial evidence *72 to reach its determination. General Laws c. 30A, §1(6), defines “substantial evidence” as “such evidence as a reasonable mind might accept as adequate to support a conclusion.” However, the court “is not required to affirm the [Office] merely on a finding that the record contains evidence from which a rational mind might draw the desired inference.” Edward E. v. Department of Social Servs., 42 Mass.App.Ct. 478, 480 (1997), quoting Cohen v. Board of Registration in Pharmacy, 350 Mass. 246, 253 (1966). The court must instead make its determination “upon consideration of the entire record.” Id., quoting G.L.c. 30A, §14. “The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.” Edward E., 42 Mass.App.Ct. at 481 (internal citations omitted).
This approach to the “substantial evidence” standard “puts teeth in the notion that the record must be evaluated by looking not only at what supports the conclusion the [Office] reached but also at what detracts from that conclusion.” Minnehan v. Department of Social Servs., 10 Mass. L. Rptr. 364; 1999 Mass.Super. LEXIS 325 at *46 (Aug. 14, 1999).
In the present case, a number of factors detract from the conclusion reached by the Office. First, it appears clear from the evidence accepted by the Office that Ibanez grabbed Jerry in order to stop him from fighting and throwing things around the room. Jerry himself admitted that he had been fighting and throwing things just prior to Ibanez interceding in response to the commotion. The Office also found that Jerry had had behavioral problems in the past, including fighting with the other children, who were much smaller than him. Several of the other children were in the room with Jerry at the time, and it was possible that he would hurt them. Moreover, the doctor who examined Jerry after the incident noted that some of his injuries, including the scratches, may not have resulted from the incident at all. Consideration of the entire record, therefore, indicates that Ibanez likely inadvertently bruised Jerry by grabbing his arms while attempting to break up a fight and protect the children. This is not substantial evidence that Ibanez abused Jerry.
The Office’s determination that the children were neglected also lacks substantial evidence. Although Jerry, Lillian, Jayden, and Benjamin all saw the incident, the actions they witnessed consisted only of Ibanez grabbing Jerry, Jerry falling to the ground, and Ibanez throwing or dropping Jerry’s video game system. The Office has failed to adequately explain why the children witnessing this incident demonstrates that Ibanez failed to provide them with “emotional stability and growth.”
On this state of the record, the court finds that the evidence that the Department relied upon, and that the Office accepted as substantial, was not. It lacked the character of substantiality which would support the department’s decision that Ms. Ibanez abused Jerry and neglected the other children in her care, with the serious consequence of placing her name on its registry of alleged perpetrators and all of the disqualifications that flow from such a classification. Edward E., 42 Mass.App.Ct. at 487.
Order
For the foregoing reasons, the plaintiffs motion for judgment on the pleadings is ALLOWED. It is hereby ORDERED that the Department’s decision finding that Ms. Ibanez had abused Jerry and neglected the other children is REVERSED, and that her name be removed forthwith from the Department’s registry of alleged perpetrators or any other list or registry of persons alleged to have abused or neglected children.
Batch Number: ME120716A
Edited by:Bob
Proof Read by:
Number of Opinions: 1
Beginning Character Count: 40044
Current Character Count: 40101