Edward E. *vs.* Department of Social Services.

No. 95-P-1460.

Suffolk. December 3, 1996. - April 16, 1997.

Present: Perretta, Kass, & Jacobs, JJ.

*Child Abuse. Evidence,* Hearsay. *Administrative Law,* Hearing, Substantial evidence, Judicial review. *Words,* "Substantial evidence."

No substantial evidence supported a determination of the Department of Social Services that there was reasonable cause to believe that a certain child had been sexually abused and the consequent listing of the alleged abuser's name on the department's registry of alleged perpetrators. [484-487]

Civil action commenced in the Superior Court Department on October 14, 1994.

The case was heard by *Suzanne DelVecchio,* J.

*Howard I. Rosen* for the plaintiff.

*Katherine M. Potter,* Assistant General Counsel, for the Department of Social Services.

Perretta, J. Upon oral notification by a mandated reporter that Edward E.'s three year old daughter had stated that her father had touched her "private parts," the Department of Social Services (department) assigned a social worker to investigate the allegations. That investigation led the social worker to conclude that there was reasonable cause to believe that the child had been sexually abused, and the department determined that the allegations were "supported." See 110 Code Mass. Regs. § 4.32(2) (1994). Consequently, the matter was referred to the district attorney, and the father's name was listed on the department's registry of alleged perpetrators (see G. L. c. 18B, § 7[*b*]), where it would remain for seventy-five years in the absence of reversal of the department's deci-

sion.[1] The father unsuccessfully sought review of the department's decision at an administrative "fair hearing." See 110 Code Mass. Regs. § 10.08 (1994). He then sought judicial review of the decision under G. L. c. 30A, § 14. A Superior Court judge found and concluded that the allegations against the father were supported by substantial evidence.[2] This appeal is from that judgment, which we reverse.

1. *The administrative decision.* At the conclusion of the fair hearing, the hearing officer found that the child had stated to three different people (the mandated reporter, a social worker for the department, and a therapist) that her father touched her genital area, that her use of the phrase "private parts" was not an uncommon term for a child of her age to use in referring to the genital area, that she indicated that the touchings had occurred in the bathroom, that she had not retracted the allegations, and that she remained in psychotherapy. Based upon his findings that the father, who was divorced from the child's mother, had "visitation with the child and therefore was entrusted with a degree of responsibility for the child as well as having access to the child," the hearing officer also found that the father was a "caretaker" of the child within the meaning of 110 Code Mass. Regs. § 2.00(7) (1993).[3]

Concluding that the child's disclosures to three different individuals constituted substantial evidence, the hearing officer ruled that the father had failed to meet his burden of proving that the department's decision was erroneous. See 110 Code Mass. Regs. § 10.06(8)(c) (1994).

2. *Substantial evidence.* Both G. L. c. 30A, § 1(6), as inserted by St. 1954, c. 681, § 1, and 110 Code Mass. Regs.

[1]See G. L. c. 119, § 51B; 110 Code Mass. Regs. §§ 4.37 (1993) and 4.51 (1994).

[2]The record before us does not disclose whether, as a result of the referral to the district attorney, any criminal proceedings were commenced and, if so, their outcome. Compare *Covell* v. *Department of Social Servs., ante* 427 (1997).

[3]As defined by the regulation a "caretaker" not only means a child's parent but also includes, in pertinent part: "(e) any other person entrusted with the responsibility for a child's health or welfare whether in the child's home . . . [or] a relative's home . . . . The 'caretaker' definition is meant to be construed broadly and inclusively to encompass any person who is, at the time in question, entrusted with a degree of responsibility for the child . . . ."

§ 4.37 (1993), define "substantial evidence" as "such evidence as a reasonable mind might accept as adequate to support a conclusion." Three witnesses testified at the fair hearing: the father, his present wife, and the child's on-going social worker for the department, Deborah Sullivan.[4] In addition to the testimony, the hearing officer had before him the report of the investigation conducted by the department after receipt of the mandated report. See G. L. c. 119, §§ 51A and 51B.

Except for Sullivan's testimony, all the evidence tending to show that the father had sexually abused his daughter was multi-level hearsay, admissible at the fair hearing under G. L. c. 30A, § 11(2), G. L. c. 119, § 21, and 110 Code Mass. Regs. § 10.21 (1993). Relying exclusively upon *Sinclair* v. *Director of the Div. of Employment Security*, 331 Mass. 101, 103 (1954), the father argues that a decision based solely upon uncorroborated hearsay cannot constitute substantial evidence.

*Sinclair* was explicated and limited in *Embers of Salisbury, Inc.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 526, 530 (1988): "Although in that case we said that '[i]f the pertinent evidence is exclusively hearsay, that does not constitute "substantial evidence" even before an administrative tribunal,' *Sinclair, supra* at 103, the line we were drawing was not between evidence admissible in a court and evidence that is inadmissible because of the rules of evidence observed by courts, but between evidence having indicia of reliability and probative value and that which does not."

The question before us is not whether the administrative decision was based exclusively upon uncorroborated hearsay but whether the hearsay presented at the fair hearing was reliable. Even then, our review does not end. "Significantly, we are not required to affirm the board merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. Our determination must be made 'upon consideration of the entire record.' *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), quoting from G. L. c. 30A, § 14 (8) (State Administrative Procedure Act). L.L. Jaffe, [Judicial Control of Administrative Action] 600-602 [1965]. 4 K.C. Davis, Administrative

---

[4]Although the record does not reveal why, it appears that the department has legal custody of the child with physical custody in the mother.

Law 127 (1958). 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' *Cohen, supra,* quoting from *Universal Camera Corp.* v. *NLRB,* 340 U.S. 474, 488 (1951). L.L. Jaffe, *supra* at 602. W.B. Leach & P.J. Liacos, Massachusetts Evidence 330 (4th ed. 1967). See also *Arthurs* v. *Board of Registration in Medicine,* [383 Mass.] 299, 304 (1981)." *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981). See *Tenneco, Inc.* v. *Commissioner of Revenue,* 401 Mass. 380, 383-384 (1987).

3. *The evidence.* We set out the evidence presented to the hearing officer, turning first to the documentary submissions. After receiving a mandated report on April 19, 1994, a social worker for the department assigned the case for investigation to another department social worker, Cherry Rooney. Rooney commenced her investigation the next day and filed her report within the week. As recounted in her report, Rooney met first with Sullivan, the child's social worker. According to Rooney's account of the meeting, Sullivan told her that an extensive sexual abuse evaluation had been done on the child by a Felicia Hagberg. At that time, the child made no disclosure of abuse. Sometime subsequent to the evaluation, again we are not advised when, but during a regularly scheduled visit between Sullivan and the child, the child told Sullivan that "my daddy touched my private parts." The child was then referred to Hagberg for therapy during which, at some undisclosed time, she talked about, according to Rooney from Sullivan from Hagberg, "bad dreams about her dad." Sullivan also told Rooney that there were "additional disclosures to Hagberg."

As part of her investigation, Rooney had a telephone conversation with Hagberg. Hagberg confirmed that a sexual abuse evaluation of the child had been done about five months earlier, and that the child had made no disclosure at that time. Therapy with the child began two months after the evaluation, and during therapy, the child told Hagberg that her father had touched her private parts and had hurt her. According to Rooney's account of her conversation with Hagberg, "[the child] has not been able to talk about specifics but she has stated that 'she has scary dreams of daddy.' " Hagberg also told Rooney that the child's mother told her (Hagberg) that the child has trouble sleeping.

In addition, Hagberg related to Rooney an incident with the child which occurred a month after therapy began. Rooney records that incident as follows: "[The child] stated to Felicia [Hagberg] that daddy kissed my private parts. When asked where this happened . . . [the child] stated on the couch, my couch at home. When pressed for more information . . . [the child] became silly and spoke in gibberish which her mother stated to Felicia is . . . [the child's] way of avoiding talking about things."

It appears from Rooney's report that Hagberg told her that the term "private parts" came up with the child several times. As relayed by Rooney from Hagberg: "During the sexual abuse evaluation, using the anatomical dolls, the term was used and she [Hagberg] feels that . . . the child has a clear understanding of what it means."[5] Rooney reported that Hagberg was of the view that the child cannot be ignored in her statements, that the child, notwithstanding many opportunities to do so, has never mentioned being touched by anyone else.

Rooney also spoke on the telephone with the mandated reporter.[6] The identity of the mandated reporter was redacted from Rooney's account of the conversation. According to Rooney, the mandated reporter stated the child disclosed on two separate occasions that her father had touched her "privates." The reporter told Rooney that the child said the touchings occurred at the home of her aunt who was at that time supervising the father's visitation.[7] Rooney noted that the reporter stated that when the child made the disclosure, she appeared withdrawn and that she regressed and put her thumb in her mouth and her head in her mother's lap.

Although we do not know when the child made these disclosures, the mandated reporter told Rooney that the child

---

[5]We cannot ascertain from this account whether, in using the anatomical dolls, the term "private parts" was spoken by the child or the usage was suggested to the child by Hagberg. It appears in Rooney's report of her investigation that the father had informed the mandated reporter that he believed the child learned the term from "clinicians."

[6]Because Rooney's report of her conversation with the mandated reporter tracks the information contained in the mandated report which was also placed in evidence, we do not repeat the contents of that exhibit.

[7]Because it appears in the record that at one time the father's supervised visits took place at the home of the mother's brother, we presume that the aunt referred to in the report is the brother's wife.

made the second disclosure just before a visit with the father and his present wife who was then supervising visitation.

Rooney also spoke with the father on the telephone. He denied ever touching his daughter and expressed his concern that someone may have abused her. He told Rooney that three weeks earlier the child asked him, "daddy did you touch my private parts?" The father asked the child if she knew the meaning of the term "private parts." When the child responded that she did not, he explained to her what the term meant.

The investigation was completed with a meeting between the child's mother and Rooney during which the mother told Rooney that no one but the father has had access to the child to abuse her and that the child has never made statements about anyone else. The mother reported to Rooney that a month earlier the child told her that her father had kissed her private parts and she his. In response to inquiry from her mother, the child described her father's genitals in terms which could be deemed as generally accurate for a three year old child. The mother also showed Rooney a calendar in which she chronicled her concerns.

The only additional facts presented to the hearing officer are those set out in a "Stipulation Of Facts In Lieu of Transcript" entered into by the department and the father for purposes of the father's appeal to this court. According to the parties' stipulation, Sullivan testified that there was contentious litigation between the mother and the father, that there was a possibility that the mother prompted the child to make the allegations against him, and that in view of the litigation between the child's parents, that possibility "was investigated and was stil' under investigation but no result or conclusion had been reached." Sullivan also stated that a physical examination of the child had been conducted by the child's therapist "who found insufficient data to warrant any finding of abuse."

The father testified that he had never touched or kissed the child's private parts nor had he ever exposed his genitals to her. He further related that, by order of the Probate Court, all his visits with the child were supervised and that he was

never alone with her.[8] He stated that about four months prior to the hearing, he was visiting the child at the home of her mother's brother. During that visit, the child told the father that he had never touched her private parts. When her mother came into the room and asked the child whether her father had ever touched her private parts, the child replied that she was not going to tell "fibs" anymore.

The father's present wife, a captain in the United States Army who had received a medical discharge as a result of a parachute accident, testified that the father was never alone with the child and that, had she ever seen him abuse the child, she would have taken the child from him immediately and would have left him.

4. *The substantiality of the evidence.* The reliability of the multi-level hearsay statements at a fair hearing is not established by the mere fact that they are made admissible as evidence by statute and regulation. Rather, to determine the reliability of the multi-level hearsay statements, we look to the circumstances under which they were they made. Cf. *Commonwealth* v. *Fuller*, 399 Mass. 678, 683 (1987); *Commonwealth* v. *Colin C.*, 419 Mass. 54, 65 (1994); *Commonwealth* v. *Joubert*, 38 Mass. App. Ct. 943, 945 (1995); G. L. c. 233, § 82(*c*)(i)-(iv).[9]

There are few reasonable indicia of reliability in the evidence to support the child's statements. In arguing that its evidence was substantial, the department claims that the child

[8]The record affords no explanation of the basis for the Probate Court order.

[9]As added by St. 1990, c. 339, and as here relevant, § 82 provides that hearsay statements of a child describing sexual contact are admissible in civil proceedings, except those brought under subparagraph C of G. L. c. 119, §§ 23 or 24, if a judge finds the statements are reliable. The statute further provides: "For the purposes of finding circumstances demonstrating reliability . . . a judge may consider whether the relator documented the child witness's statement, and shall consider the following factors: (I) the clarity of the statement, meaning, the child's capacity to observe, remember, and give expression to that which such child has seen, heard, or experienced; provided, however, that a finding under this clause shall be supported by expert testimony from a treating psychiatrist, psychologist, or clinician; (ii) the time, content and circumstances of the statement; (iii) the existence of corroborative evidence of the substance of the statement regarding the abuse including either the act, the circumstances, or the identity of the perpetrator; (iv) the child's sincerity and ability to appreciate the consequences of the statement."

"spontaneously disclosed to three different adults that it was . . . [the father] who had touched and kissed her private parts." There is nothing in the evidence, however, which shows the circumstances of the child's statements to the mandated reporter, to Hagberg, or to Sullivan from which one would infer that they were spontaneously made.

There is nothing about the circumstances of the child's statement to Hagberg, that her father kissed her private parts, that drapes them with the quality of reliability. Hagberg related to Rooney that the child stated that the kissing episode happened "on . . . my couch at home." When "pressed" for more information, the child became "silly and spoke in gibberish." Moreover, the record indicates that the father's visitation was first supervised by the child's aunt in the aunt's home and then by the father's present wife. If, as Sullivan had testified at the fair hearing, there was contentious litigation between the child's parents, we think it unlikely that the father's present wife would supervise visitation in the child's home.

The only person to whom the child made the statement that she had kissed her father's private parts, in addition to Hagberg, was her mother, who did not testify at the fair hearing. However, Sullivan did testify that in light of the litigation between the parents, there was a possibility that the mother had prompted the child to make her allegations, that possibility was under investigation, and that no result or conclusion had been reached as of the time of the hearing.[10]

Hagberg also told Rooney that the child "has scary dreams of daddy" and that the mother told her that the child was having trouble sleeping. Again, there is nothing to show the circumstances in which that statement was made nor is there any information concerning the details of the dreams.

The department also argues that the child's statements were "clear, detailed, and consistent over time." Although the child's statements can be understood readily, it is not at all clear from Rooney's account of her conversation with Hagberg whether, in using the anatomical dolls, the term "private parts" was spoken by the child or usage of that

---

[10]The hearing officer does not appear to have relied upon any hearsay statements of the child related by the mother to Sullivan and then to Rooney. Rather, his findings show that he relied upon the child's hearsay statements to Sullivan, to Hagberg, and to the mandated reporter.

phrase was suggested to the child by Hagberg. While Rooney also related that Hagberg "feels that the child has a clear understanding of the term," there is nothing in Rooney's report which shows the basis for the feeling expressed by Hagberg.

Additionally, we do not agree with the department's view that the details in the child's statements bespeak reliability. The only detail offered by the child concerning the alleged touchings is that they took place at the home of the aunt who was supervising the visits at the time of the touchings. Although the hearing officer stated in his decision that the child "indicated that the touchings had occurred in the bathroom," we found no such indication by the child anywhere in the record. Indeed, Hagberg informed Rooney that the child "has not been able to talk about specifics."

Although it appears from the department's account of the mandated report that the child "repeatedly" stated that her father had touched her private parts, Rooney's conversation with the mandated reporter reflects that the child at most made the statements on two separate occasions, one of which was in the presence of the mother. As for the statements to Hagberg and Sullivan, there is no information concerning when or how often the statements were made. We note also that the child's statements all appear to have been made several months after completion of the inconclusive sexual abuse evaluation.

Even if one accepted the department's assertion that the evidence showed the child's statements had been made "consistently," statements supported with little, if any, indicia of reliability do not attain trustworthiness through a process of repetition.

Not only is there an absence of evidence to show the time and circumstances of the child's statements, there is no evidence to corroborate that the touchings occurred or that the child could even appreciate what she was expressing. The department's evidence showed, at best, that subsequent to a contentious divorce between the parents and an inconclusive sexual abuse evaluation, the three year old child made and repeated allegations of sexual touchings of her by the noncustodial parent during supervised visits, that there existed the possibility that the mother prompted the child to make the allegations, and that possibility was still under investiga-

tion. On this state of the record, we think the evidence upon which the department relied was so persistently encumbered by unreliability that it fails to have the character of substantiality which would support the department's decision to place the father's name on its registry of alleged perpetrators for a period of seventy-five years. That was a decision, we may add, of more than ordinary gravity in that it places a permanent mark on a person.[11]

Accordingly, the judgment is reversed, and the matter is remanded to the Superior Court for entry of a new judgment reversing the decision of the department and ordering that the father's name be removed from the registry of alleged perpetrators.

*So ordered.*

---

[11]Although access to the registry is limited by 110 Code Mass. Regs. § 4.38 (1993), we note that subparagraph 4 of that section permits access by anyone who obtains the written authorization of the commissioner of the department. Nothing in § 4.38 provides for notice, at *any* time, to an alleged perpetrator that the commissioner has given written authorization for disclosure.