Kottmyer, J.
Pursuant to G.L.c. 30A, §14(7), the plaintiff, John Ferreira (“Mr. Ferreira”), seeks judicial review of a Fair Hearing Decision of the defendant, Department of Social Services (“DSS”). The Hearing Officer upheld a decision of DSS to “support” a report accusing the plaintiff of sexually abusing his daughter[1] and to place his name on DSS’s “Registry of Alleged Perpetrators” (“the Registry”).[2] See G.L.c. 119, §§51A and 51B; 110 C.M.R. §§4.36, 4.37(2) (1996). The matter is before the Court on the parties’ cross-motions for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) and Standing Order 1-96(4). For the following reasons, the plaintiffs motion for judgment is ALLOWED and the defendant’s motion is DENIED.
ADMINISTRATIVE RECORD[3]
On January 9, 1997, DSS received a report, filed by a mandated reporter pursuant to G.L.c. 119, §51A, alleging that Mr. Ferreira had sexually abused his then three-year-old daughter, Gia Ferreira (“Gia”).[4] Admin. R. 43. The report was prompted by a January 2, 1997 telephone call from Gia’s mother, Jayne Ferreira (“Mrs. Ferreira”), to a sexual abuse clinic in which Mrs. Ferreira stated that on December 29, 1996, Gia had told Mrs. Ferreira that her “peepee” was sore and that Mr. Ferreira had scratched her “peepee.” Admin. R. 46. Mrs. Ferreira had then asked Gia how Mr. Ferreira had done this and whether his fingers went anywhere. Id. Gia had responded that Mr. Ferreira’s fingers went inside her “like this” (motioning to her vagina and twisting her fingers). Id. The subject was next raised when Gia asked Mrs. Ferreira whether Mr. Ferreira scratched her “peepee.” Id. Mrs. Ferreira responded: ”[S]ometimes if I am itchy.” Id. Mrs. Ferreira then asked Gia whether Mr. Ferreira had asked her to scratch him in the same way, Gia responded: ”No[,] I don’t scratch his pee pee or bum.” Id.
On January 3, 1997, Mrs. Ferreira met with an employee of the sexual abuse clinic. Admin. R. 47. During this meeting, Mrs. Ferreira expressed doubt about Gia’s allegations of abuse and downplayed previous statements concerning the frequency of Gia’s masturbation and her increasing aggression. Id. Mrs. Ferreira stated that she did not want Gia’s allegations to destroy Mr. Ferreira’s career. Id. Mrs. Ferreira also revealed that Mr. Ferreira continued to spend time alone with Gia at bedtime. Id.[5]
On January 9, 1997, DSS assigned an investigator to conduct an investigation in accordance with G.L.c. 119, §5 IB. Admin. R. 49. The investigator spoke on the telephone with Mrs. Ferreira and informed her of the G.L.c. 119, §51A report. Id. Mrs. Ferreira told the investigator that she would confront Mr. Ferreira that evening and ask him to leave the marital home. Id. Mrs. Ferreira also agreed to ask Mr. Ferreira to call DSS. Id.
On January 13, 1997, Mr. Ferreira called DSS. Id. He confirmed that he had moved out of the home and that he had made an appointment to meet with a DSS social worker later that day. Id. At the meeting, a social *54 worker reviewed the allegations set forth in the §51A report with Mr. Ferreira. Admin. R. 51. Mr. Ferreira denied ever touching his daughter sexually. Id. He did, however, confirm that once or twice a week he would, at Gia’s behest, scratch her “bum cheeks” both above and beneath her clothing. Id. 51-52. Mr. Ferreira explained that he had been brought up believing scratching to be a nurturing activity. Id. 51. Mr. Ferreira also stated that he and Mrs. Ferreira had had an unstable relationship for most of their marriage and that Mrs. Ferreira would often misconstrue information. Id.[6]
Also in Januaiy, Gia was interviewed by a DSS social worker and physically examined and interviewed at Children’s Hospital in Boston. Id. 59. Neither yielded evidence of abuse. Id. On January 17, 1997, DSS “unsupported” the G.L.c. 119, §51A report of abuse,[7] concluding that there was not reasonable cause to believe that the abuse had occurred. Admin. R. 54. DSS cited Gia’s failure to disclose the abuse to the DSS social worker and the lack of any medical evidence of sexual trauma. Admin. R. 54. The DSS supervisor concurred in the decision noting that “the father's scratching behavior appears to have been playful and inappropriate, rather than abusive.” Admin. R. 55.
On January 24, 1997, Mrs. Ferreira requested an evaluation of Gia at the Boston Regional Medical Center (“BRMC”) and Gia was seen by a BRMC counsellor on a regular basis from January 27, 1997 until August 13, 1998.[8] On February 8, 1997, Gia told the therapist that her father “scratches” her vagina. Admin. R. 149.
On February 28, 1997, DSS received a second report of abuse pursuant to G.L.c. 119, §51A. Admin. R. 56. The report cited additional disclosures of abuse by Gia that Mrs. Ferreira believed merited further investigation. Id. 59. According to Mrs. Ferreira, Gia had told her that Mr. Ferreira would take Gia to “the big bed” and would manipulate her genitals with his fingers. Id. Mrs. Ferreira also mentioned an incident from February 25, 1997 when she had reached into the back seat of her car to comfort Gia, and Gia had stated “you can touch my arms but you can’t... touch my peeps.” Id. Gia added that she touched herself. Id. Mrs. Ferreira asked Gia whether anyone else had touched her “there.” Id. Gia responded, “Daddy.” Id.
Pursuant to G.L.c. 119, §5 IB, a second investigation was initiated. Admin. R. 56. On March 10, 1997, a DSS social worker interviewed Mr. Ferreira. Id. 62-63. Mr. Ferreira again denied ever touching Gia sexually. Id. 62. He added that although he saw Gia and her sister Jayci Ferreira (“Jayci”)[9] every day, he had not been alone with them since December 1996. Id. Mr. Ferreira stated his belief that the allegations of abuse had been manufactured by Mrs. Ferreira. Id. Mr. Ferreira described Mrs. Ferreira as jealous and unstable. On one occasion when he did not come directly home from work, Mr. Ferreira stated that Mrs. Ferreira had set fire to his clothes. Id. 62, 126.[10] In concluding the interview, Mr. Ferreira stated that Mrs. Ferreira was doing nothing to prevent the bullying of Gia and Jayci by her two other children, Teneyke Smith and Tyler Smith.[11] Id. 63. He also expressed concern that Mrs. Ferreira had discouraged Gia and Jayci from visiting him at the YMCA where he worked by telling them that there were germs in the building. Id.
The investigator also spoke by telephone with Gia’s BRMC therapist. Id. 59, 148. The therapist expressed concern over an incident that occurred on February 28, 1997, while the therapist and Gia were working through a book called “It’s My Body.” Admin. R. 63, 150. The book addressed the subject of touching, and Gia stated that a long time ago her father had touched the inside of her “bum,” making it sore. Id. 63, 67-68, 150. Gia added, “I don’t want to tell him to stop because he’ll be sad and I’ll hurt his feelings.” Id. 150. Gia also stated that Mr. Ferreira “didn’t realize it hurts my bum.” Id.
On March 10, 1997, DSS “unsupported” the second G.L.c. 119, §51A report. Admin. R. 66. DSS concluded that the allegations of abuse were unreliable by dint of the alleged instability of their principal declarant, Mrs. Ferreira, and the confused concept of touching that had developed from the family practice of scratching. Id. DSS also cited the confusion arising from the Ferreira children’s ignorance of the proper names for their body parts. Id. 67-68. According to the investigator’s notes, the BMRC therapist questioned whether Gia could differentiate between her “anus” and “vagina” and did not think that Gia knew exactly what part of her body she was referring to when she said “inside.” Admin. R. 67-68. Accordingly, it was unclear what Gia meant when she said that her father had touched her “inside [her] bum.” Id.
In June 1997 Mr. Ferreira filed for divorce. Id. 78. At this time, Mrs. Ferreira told Gia’s therapist that Mr. Ferreira was starting to date other women. Id. 153. According to the therapist, Mrs. Ferreira was very angry with Mr. Ferreira for dating another woman. Id. The therapist also noted that Mrs. Ferreira appeared upset and depressed. Admin R. 153. In July 1997, Mrs. Ferreira entered a one-week outpatient psychiatric program. Id. 154.
Mrs. Ferreira, Gia, and Jayci continued to visit the BRMC therapist. On July 14, 1997, Mrs. Ferreira reported the exploration by Gia of Jayci’s “private parts” to the therapist. Id. 154. On September 5, 1997, Gia reported that Mr. Ferreira had put his hand on Jayci’s thigh and his thumb on her “peeps” when he was helping Jayci to pull up her pants. Id. 156.[12] Gia stated that there was no penetration and that “Dad had told her about it.” Id. At the same session, the therapist told Mrs. Ferreira that Gia couldn’t remember what she told mother about what happened in the *55 backseat of father’s car. When questioned by the therapist, Gia talked about playing hide and seek and tag in the car and denied physical touching by her father. According to the therapist, Mrs. Ferreira “appeared disappointed that there was no confirmation of inappropriate sexual touching” of Gia by Mr. Ferreira. Id. The therapist noted that Mrs. Ferreira said that she felt that Mr. Ferreira had instructed Gia and Jayci not to talk about the incidents of abuse. Admin. R. 156.
On September 9,1997, the therapist asked Gia why she was unable to tell the therapist the same “stories” that she told Mrs. Ferreira. Id. 157. Gia responded that she was scared “about Daddy getting mad at her.” Id. Gia told the therapist that Daddy told her he would be mad if she told the stories. She stated she would tell the therapist when she was ready. The therapist noted that it appeared that Gia was being manipulative and it is “unclear what the accurate story is.” She posited that Gia “could be making up [the] stories to [increase Mrs. Ferreira’s] interest” in her. Id. Mrs. Ferreira was frustrated and wanted to know how long this would go on. The therapist said that Gia might never be able to tell her and agreed with Mrs. Ferreira that this was unfair.
At the next session (Admin. R. 158), the therapist inquired about statements made by Gia to Mrs. Ferreira about “games” played with Mr. Ferreira involving their bodies. Gia was unable or unwilling to discuss the stories. She told benign stories. The therapist noted that “Gia’s refusal to talk at more length about them makes me wonder if the stories are exaggerated and made up of a sexual nature to impress mother.” She discussed the difference between “made up” and “true” with Gia and Mrs. Ferreira. Id. 158. According to the therapy notes, Gia stated that the stories were “made up.” Id. The notes from the session conclude by stating that Gia appeared angered by Mrs. Ferreira’s insistence that she talk about the stories. Admin. R. 158. The notes from the next two therapy sessions cite Gia’s recalcitrance. Id. 159. In the latter of these sessions, the therapist noted Mrs. Ferreira’s concern that Mr. Ferreira had told Gia and Jayci “not to talk.” Id. The therapist remarked that Gia “[alppears wary of talking about anything for fear of saying something she should not.” Id. Notes from the December 19, 1997 therapy session state that a sexual abuse evaluation at CFD Beverly was completed, Gia reporting that she was “afraid that if she ‘told the truth’ her daddy would not be her father any more,” but also that all of her previous stories were lies. Id. 161.
On March 10, 1998, DSS received a third report of abuse mandated by G.L.c. 119, §51A. Admin. R. 23, 77.[13] The report stated that during a sexual abuse evaluation of Gia and Jayci (presumably the evaluation described in the BRMC’s December 19, 1997 notes), Gia had disclosed that “Dad peeps touched my peeps” and that he had tried to stick his finger in Jayci’s “peeps.” Id. 23. Pursuant to G.L.c. 119, §5IB, DSS initiated another investigation. Admin. R. 77. On March 18, 1998, a representative of the independent Sexual Assault Investigation Network (“SAIN”) conducted interviews of Gia and Jayci. Id. 79. At her interview, Gia stated that a long time ago Mr. Ferreira had scratched her on her “peeps” and on her “butt” while she and Mr. Ferreira were “playing monster” on Mrs. Ferreira’s bed and her mother was working in the kitchen. Id. Gia identified her vaginal area as her “peeps.” Id. Gia stated that she thought that Mr. Ferreira’s hand had gone under her clothes. Id. According to the report Gia stated that she “was wearing the same thing she has on now.” She stated that Mr. Ferreira had unbuttoned her clothes and taken off her shirt, leaving her naked. Id. Gia stated that Mr. Ferreira moved his hand inside her “peeps” and that when he touched her “butt” his hand moved. Admin. R. 79-80. Gia stated that Mr. Ferreira stopped when she said “mom, dad has been touching my butt again.” Id. 80. Gia also said that Mr. Ferreira had touched her “butt” earlier the same day on the couch. He used his hands and nails and she was crying. Id. “Now she thinks about it, it did happen.” She said that after she told Mrs. Ferreira about this incident, Mr. Ferreira had had to leave. Id. The SAIN interviewer concluded that Gia seemed “very sincere” and seemed to have conflicting feelings regarding [her father’s] abuse and her love for him. Id. The SAIN interview with Jayci yielded no evidence of abuse. Id.[14]
On March 24, 1998, at a DSS interview, Mr. Ferreira denied the allegations repeated in the G.L.c. 119, §51A report. Admin. R. 78. He stated that he had not seen Gia or Jayci in six months and posited that Mrs. Ferreira had persuaded Gia to make the aforementioned allegations of abuse. Id. Mr. Ferreira added that Mrs. Ferreira was violent towards him, was suicidal, on psychotropic medication, and that she was being treated for depression. Id.
On April 3, 1998, DSS received a fourth report of abuse mandated by G.L.c. 119, §51A. Admin. R. 70. The report stated that during a sexual abuse evaluation, Jayci disclosed that “a long time ago” Mr. Ferreira had “touched [her] in the peeps and the butt.” Id. Therapy notes from April 7, 1998 state that although Gia and Jayci missed Mr. Ferreira, Gia did not appear to feel guilty about her disclosures of abuse. Id. 162.
On April 13, 1998, DSS “unsupported” the fourth G.L.c. 119, §51A report of abuse, citing the incomplete nature of Jayci’s sexual abuse evaluation. Admin. R. 81. On the same date, however, citing Gia’s disclosure to an independent evaluator of digital penetration by Mr. Ferreira, DSS “supported” the allegations of the third G.L.c. 119, §51Areport. Admin. R. 81. DSS listed Mr. Ferreira’s name on the Registry and, pursuant to G.L.c. 119, §51B(4), referred the case to the Middlesex District Attorney’s office. Admin. R. 22, 41, 81.
On June 1, 1998, DSS sent a letter notifying Mr. Ferreira of his listing on the Registry and of his right *56 to appeal that listing at a “Fair Hearing” pursuant to 110 Code Mass. Regs. §10.06(8) and (9)(a). Id. 41. Mr. Ferreira exercised that right, and on May 6, 1999, a Fair Hearing was conducted at the Malden Area Office of DSS. Admin. R. 6,182.
At the Fair Hearing, DSS relied primarily on the evidence of abuse contained in its “supported” G.L.c. 119, §§51A and 5 IB reports from March 1998. Admin. R. 6-14.[15] Mr. Ferreira challenged this evidence by introducing the G.L.c. 119, §§51A and 51B reports from January and February of 1997 that DSS had “unsupported.” Id. 7. Also introduced were a psycho-sexual evaluation of Mr. Ferreira and numerous letters of support. Id. Plaintiff also introduced evidence substantiating his allegations that in 1993, Mrs. Ferreira had made false allegations of marijuana use by his coworkers when she suspected he was having an affair, had set fire to his clothes after a dispute on May 15, 1993, and in 1997 made threatening calls to him and his landlord. (Admin. R. 119-27, 144-45.)
On September 29, 1999, the record was reopened and DSS was ordered to complete a clinical review pursuant to 110 C.M.R. §10.08. Admin. R. 42. A Clinical Review Team consists of at least five individuals, each of whom must have extensive social work experience, which is convened by DSS’ Regional Director for the purpose of reviewing a DSS decision. 110 Code Mass. Regs. §§10.02 and 10.08. The Fair Hearing officer may not reverse a clinical decision of the Clinical Review Team if the decision has a reasonable basis. Id. §10.05 The review was conducted by the Metro Regional Clinical Team which upheld the decision to support the report and list plaintiff on the registry.
By a decision dated December 15, 1999, the Fair Hearing officer found that there was reasonable cause to “support” the G.L.c. 119, §51A report of sexual abuse by Mr. Ferreira and substantial evidence of sexual abuse. Id. 11-13. The officer thus affirmed the DSS decision to “support” the third G.L.c. 119, §51A report and its decision to list Mr. Ferreira’s name on the Registry. Admin. R. 13-14. Pursuant to G.L.c. 30A, § 14(7)(e), Mr. Ferreira seeks judicial review of the Fair Hearing decision.
APPLICABLE LAW
DSS “supports” a §51A report if it is persuaded that there is reasonable cause to believe that an incident of sexual abuse by a “caretaker” occurred. 110 C.M.R. §4.32(2). The regulations define “reasonable cause to believe” as a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been abused or neglected. 110 C.M.R. §4.32(2).
An “alleged perpetrator” of child abuse is listed in the Registry only if (1) the allegations in the 51A report are, after investigation, “supported” and referred to the District Attorney pursuant to G.L.c. 119, §51B(4), and (2) there is substantial evidence that the alleged perpetrator was responsible for a child’s abuse[16]” or neglect. 110 C.M.R. §4.37. “Substantial evidence” is defined, as it is in G.L.c. 30A, as “such evidence as a reasonable mind might accept as adequate to support a conclusion.”
There is an administrative appeal from a decision to “support” a report of “abuse” or to place an individual’s name on the Registry. 110 C.M.R. §10.06(8). Appellate proceedings take place before hearing officers employed by the DSS. 110 C.M.R. §10.03. At the hearing, the burden is on the appellant to show by a preponderance of the evidence that the DSS decision or procedural actions were not in conformity with DSS policies or regulations or that DSS acted without a reasonable basis or in an unreasonable manner which resulted in substantial prejudice to the appealing party.
If the hearing officer affirms the DSS decision, the listed individual has the right to an appeal to the Superior Court pursuant to G.L.c. 30A. After a hearing on such an appeal, “[t]he court may affirm the decision of the [DSS], or remand the matter for further proceedings before the [DSS]; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed, if it determines that the substantial rights of any party may have been prejudiced.”[17]
In reviewing a DSS decision pursuant to G.L.c. 30A, the Court is confined to the administrative record unless procedural irregularities are alleged. G.L.c. 30A, §14(5). The Court shall set aside the decision of an administrative agency if it is not supported by substantial evidence. G.L.c. 30A, §14(7)(e); Cobble v. Commissioner of Dept. of Soc. Servs., 430 Mass. 385, 390 (1999). “An agency conclusion need not be based upon the clear weight of the evidence ... or even a preponderance of the evidence, but rather upon ‘reasonable evidence’ i.e., ‘such evidence as a reasonable mind might accept as adequate to support a conclusion.’ ” Hotchkiss v. State Racing Comm’n, 45 Mass.App.Ct. 684, 696 (1998) (citation omitted); see G.L.c. 30A, §1(6); 110 Code Mass. Regs. §4.37. In making this determination, the court must examine the record in its entirety and must take into account whatever fairly detracts from the weight of evidence supporting the administrative decision. Cobble v. Commissioner of Dept. of Soc. Servs., 430 Mass. at 390. The court must, however, “give due weight to the experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it[,]” G.L.c. 30A, §14(7), and should defer to the agency on questions of fact and on reasonable inferences from the record. Cobble v. Commissioner of Dept. of Soc. Servs., 430 Mass. at 390. The party appealing an administrative decision bears the burden of demonstrating its invalidity. Merisme v. *57 Board of App. on Motor Vehicle Liab. Policies & Bds., 27 Mass.App.Ct. 470, 474 (1989).
The court may not substitute its own judgment for that of the agency, “even though the court would justifiably have made a different choice had the matter been before it de novo." South Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm’n., 386 Mass. 414, 420, 436 N.E.2d 380 (1982). Nor may the court disturb the credibility determinations of the hearing officer or her weighing of the evidence. Guarino v. Director of the Division of Employment Security, 393 Mass. 89, 92, 469 N.E.2d 802 (1984). Nevertheless, in determining whether the DSS decision rests upon substantial evidence, the court is not required to affirm the [DSS] merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. The court’s determination must be made “upon consideration of the entire record.” “The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.” Edward E. v. Department of Social Services, 42 Mass.App.Ct. 478 , 480-81, 678 N.E.2d 163 (1997). While hearsay can form a permissible basis for an agency’s decision, that hearsay must be “reliable.” Id. at 480, 678 N.E.2d 163.
DISCUSSION
Placing the burden of proof before the agency on the appellant has due process implications given that the decision is “one of more than ordinary gravity which places a permanent mark on the record.” Edward E., supra, 42 Mass.App.Ct. at 487. Judge McHugh discussed this issue in Minnehan v. Department of Soc. Servs., Civil No. 98-4687 (Middlesex Super. Ct. Aug. 14, 1999) (10 Mass. L. Rptr. 364). In that case, he concluded: “In the last analysis, it may well be that the due process clauses of the state and federal constitutions place on the DSS the burden of proving the correctness of their conclusions at the administrative level. Whether or not that is so, the Appeals Court has suggested that the concept of‘substantial evidence’ is sufficiently flexible to take account of the impact of the finding or judgment the evidence is offered to support.” He relied on Edward E. v. Department of Social Services, supra, 42 Mass.App.Ct. at 487, where the Appeals Court stated:
[W]e think the evidence upon which the department relied was so persistently encumbered by unreliability that it fails to have the character of substantiality which would support the department’s decision to place the father’s name on its registry of alleged perpetrators for a period of seventy-five years.
The due process implications are exacerbated by the provisions of 110 C.M.R. §10.05. Although Section 4.37 of the regulations makes express reference to G.L.c. 30A, §1(6) and adopts the same definition of “substantial evidence,” under §10.05 the Hearing Officer may not reverse the challenged decision without the Commissioner’s approval, and may not recommend reversal of the clinical decision made by a Clinical Review Team if there is “a reasonable basis” for the decision. 110 C.M.R. §§10.05 and 10.29. The regulations thereby effectively impose the burden of establishing that there was no reasonable basis for the clinical decision on the appellant challenging a decision that he be listed. Section 10.05 also distorts the substantial evidence analysis by requiring the Hearing Officer to accept a clinical decision which has “a reasonable basis,” notwithstanding the existence of other evidence in the record which detracts from the decision.
The Hearing Officer in the present case noted that “[t]he reasonable cause standard [applicable to decisions to support allegations under 5IB] is a relatively low standard of proof . . .” (Admin. R. 11.) She also noted, in connection with her finding that DSS had substantial evidence to list plaintiff on the Registry, Section 10.05’s prohibition against reversal of a clinical decision made by Clinical Review where there is “a reasonable basis” for the decision. She concluded that “[i]n light of the applicable standard of review and evidence presented the Department’s decision to list [Mr. Ferreira] on the Registry of Alleged Perpetrators complies with the Department’s Regulations.”
Gia did not testify at the May 6, 1999 Fair Hearing. Her statements from the reports and investigations mandated by G.L.c. 119, §§51A and 51B were, however, offered as evidence of Mr. Ferreira’s abuse. Admin. R. 7. Though hearsay, this evidence was admissible at the Fair Hearing to the extent of its reliability. See G.L.c. 30A, §11(2); 110 Code Mass. Regs. §10.21(1); Edward E. v. Department of Soc. Servs., supra, 42 Mass.App.Ct. at 480.[18] The Fair Hearing Officer found that the increased clarity and specificity of Gia’s statements at the SAIN interview and to an independent evaluation provided reasonable cause to support the allegations. Admin. R. 11-12. As support for this conclusion, the Fair Hearing officer relied upon the following: (1) the DSS investigators’ testimony that Gia was credible and not coached; (2) Gia’s prior consistent disclosure of abuse to her therapist while reading the “It’s My Body” book; (3) Mr. Ferreira’s admission to scratching Gia on her “bum” and under her clothes; and (4)-the decision of a Clinical Review Team to uphold the actions of DSS in this case. Id. 10-13.[19] The Hearing Officer concluded that substantial evidence exists that Appellant was responsible for the abuse because (1) Gia has consistently named her father as the perpetrator and “has not named anyone else; and (2) she has not recanted.” Admin. R. 13.
There is no indication that in reaching these conclusions the Fair Hearing Officer considered evidence in the record which detracted from her conclusion. She stated that Gia had not recanted. Yet, the record reflects that on at least two occasions Gia stated that the stories she had told were “made up" or “lies.” *58 Admin. R. 158, 161. The Fair Hearing Officer relied upon the fact that the DSS Investigator described Gia as very sincere and as credible and not coached. The SAIN interview took place on March 18, 1998. On September 9 and September 16, 1997, Gia’s BRMC therapist, who saw Gia and Mrs. Ferreira on a regular basis, questioned whether Gia was making up stories and/or sexualizing them to impress her mother and increase her mother’s interest in her. Admin. R. 157, 158. The Fair Hearing Officer relied on the fact that Gia’s description of the abuse had become more specific and detailed and attributed the increase in clarity to the fact that Gia’s vocabulary and awareness of body parts had developed from that of a 3.9 year old to a 4.11 year old. This is one explanation for the limited additional detail provided by Gia during the SAIN interview. But the Hearing Officer did not address in this context, perhaps because of the constraints imposed by §10.05, compelling evidence that the increased specificity and detail may have been a product of coaching by Mrs. Ferreira and of a desire on the part of Gia to please her mother. In particular, the Hearing Officer did not consider (1) that Gia frequently refused to repeat stories of abuse she allegedly had told Mrs. Ferreira and that when she did not repeat them, Mrs. Ferreira manifested disappointment; and (2) that Mrs. Ferreira had a history of instability and vindictive conduct toward Mr. Ferreira, which included fabricating allegations of marijuana use by a co-worker with whom she suspected he was having an affair. Moreover, the Hearing Officer did not address the fundamental issue recognized when the first and second 51A reports of abuse were received and unsupported namely, the inability to determine with any degree of reliability whether the scratching activity which indisputably had taken place and was the source of the allegation constituted playful, albeit inappropriate, behavior or abusive behavior. At that time of the first and second reports, the Department found the allegations “unreliable” given the instability of the principal declarant, Mrs. Ferreira, and the confused concept of touching that had developed from the family practice of touching, and Gia’s inability to identify and differentiate her body parts. Considered in the context of evidence that Mrs. Ferreira had become invested in proving the allegations, had pressured Gia to make disclosures and manifested disappointment when Gia did not repeat stories she had allegedly told Mrs. Ferreira to the BRMC therapist, that Mrs. Ferreira was angry with Mr. Ferreira and had a history of fabrication, and in view of Gia’s prior descriptions of the stories as “made up" and “lies,” the increased specificity and detail in the statements to the independent evaluator and in the SAIN interview do not render Gia’s statements reliable and do not satisfy the substantial evidence standard.
ORDER
For the foregoing reasons, the motion of the plaintiff, Mr. Ferreira, for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c) and Super. Ct. Standing Order 1-96(4) is ALLOWED. The motion of the defendant, DSS, for judgment on the pleadings pursuant to Mass.R.Civ.R 12(c) and Super. Ct. Standing Order 1-96(4) is DENIED. Judgment shall enter REVERSING the decision of the Department and ordering that plaintiff John Ferreira’s name be removed from DSS’s Registry of Alleged Perpetrators.

 See 110 Code Mass. Regs. §4.32. Section 4.32 requires that following the completion of an investigation under G.L.c. 119, §5 IB, DSS must determine whether the allegations of the G.L.c. 119, §51A report are “supported” or “unsupported.” 110 Code Mass. Regs. §4.32(1). To “support” a report means that DSS "has reasonable cause to believe that an incident ... of abuse or neglect. . . did occur.” Id. §4.32(2).

 110 C.M.R. §4.36 provides that DSS shall create and maintain a Registry of Alleged Perpetrators as a component of the Central Registry maintained pursuant to G.L.c. 119, §51F. The name of the alleged perpetrator remains on the Registry of Alleged Perpetrators for 75 years or until the decision is reversed. Section 4.38 governs access to the Registry and in subsection 4 permits access to anyone who obtains the written authorization of the commissioner. There is no provision that an alleged perpetrator be given notice of requested access. Edward E., supra, 42 Mass.App.Ct. at 487, n. 11.

 The administrative record filed on April 5, 2000 does not contain a transcript of the proceedings. Consequently, the testimony of witnesses at the Fair Hearing is not part of the record before this Court. See Arnone v. Commission, 43 Mass.App.Ct. 33, 34 n.2 (1997), where the Court stated that it was the responsibility of the agency to file a complete record.

 Gia was born April 19, 1993. Admin. R. 43.

 Three clinicians spoke with Mrs. Ferreira. Admin. R. 52. Each felt that Mrs. Ferreira did not believe Gia's allegations of abuse and that Mrs. Ferreira was resistant to intervention. Id.

 Mr. and Mrs. Ferreira had been in therapy since their 1992 marriage. Admin. R. 47, 138.

 Although a finding of abuse was unsupported, a finding of neglect based on “inappropriate boundaries” was supported. Admin. R. 54-55.

 The record contains notes from thirty-six therapy sessions between January 24, 1997 and August 13, 1998. (Admin. R. 147-66.) Plaintiff subpoenaed the notes to the Fair Hearing, but the records had not been produced at the time of the hearing, (id. 167-72.) The hearing was held on May 6, 1999, and the record was closed on June 3, 1999. On June 28, plaintiffs counsel submitted the records. On September 29, 1999, the record was reopened and DSS was ordered to complete a clinical review pursuant to 110 C.M.R. §10.08 and to consider the additional materials submitted by Mr. Ferreira. (Admin. R. 42.) The review was completed and the decision issued on December 15, 1999.

 Jayci was born November 23, 1994.

 At the hearing, plaintiff provided evidence, a police department report, substantiating this fact. (Admin.R. 126-27.)

 Teneyke Smith was born December 7, 1981 and Tyler Smith was born June 30, 1983.

 Mr. Ferreira was not alone with the girls after December of 1996. He did not see the girls between October of 1997 and June of 1998.

 On March 3, 1998, DSS had received an anonymous report of neglect. Admin. R. 84. The report alleged that Mr. Ferreira’s neighbors had stated that Mr. Ferreira smoked *59 marijuana in front of Gia and Jayci when he lived in the home. Id. The reporter further stated that she was calling “because she just heard from neighbors that the father is close to getting visitation with the children.” The circumstances of the report, details (especially dates) provided by the reporter and similarities between this report and anonymous allegations of marijuana use by co-workers of Mr. Ferreira (Admin. R. at 119-25) would support an inference that Mrs. Ferreira made this report.

 The record reveals that Jayci was interviewed a total of seven times. Admin. R. 80. On the two occasions that she spoke, Jayci disclosed only that “dad scratched my peeps.” Id.

 DSS also introduced a report from the Metro Regional Clinical Review Team and a letter from Boston Regional Medical Center to Mr. Ferreira’s attorney. Admin. R. 7.

 Abuse is defined as the non-accidental commission of any act by a caretaker upon a child under age 18 which causes, or creates a substantial risk of physical or emotional injury, or constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual. 110 C.M.R. §2.00.

 The Court may set aside a decision only upon a determination that the decision of the agency is (a) in violation of constitutional provisions; (b) in excess of the statutory authority or jurisdiction of the agency; (c) based upon an error of law; (d) made upon unlawful procedure; (e) unsupported by substantial evidence; (f) unwarranted by facts found by the court on the record as submitted or as amplified ... in those instances where the court is constitutionally required to make independent findings of fact; or (g) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G.L.c. 30A, §14(7).

 Compare G.L.c. 233, §82(c)(i)-(iv) which provides that hearsay statements of a child describing sexual contact are admissible in civil proceedings if a judge finds that they are reliable. Section 82 details factors which a judge must consider in determining reliability, including the child’s capacity to observe, remember and express what he/she has experienced as established by expert testimony and the extent of corroborative evidence.

 The Fair Hearing Officer also addressed the arguments advanced by Mr. Ferreira. Mr. Ferreira argued that Gia’s SAIN interview statements merely restated that which DSS had on two previous occasions held insufficient to “support” a mandated report of abuse under G.L.c. 119, §51A. Admin. R. 19. The Fair Hearing officer disagreed, stating that the evidence of abuse given by Gia in the SAIN interview was more detailed than anything previously offered. Id. 11-12. Second, Mr. Ferreira argued that Mrs. Ferreira had initiated the allegations of abuse out of spite because the couple were in the process of divorcing. Id. 19. The Fair Hearing officer pointed to Mrs. Ferreira’s initial reluctance to believe Gia’s allegations and the fact that Mr. Ferreira was not asked to leave the marital home and divorce • proceedings did not commence until after the allegations of abuse were made. Id. 12, 47. Third, Mr. Ferreira argued the absence of any physical evidence of abuse. Id. 17. The Fair Hearing officer, however, determined that this argument was inconclusive, as the type of abuse that Gia had alleged would not necessarily result in physical injury. Id. 12. Finally, Mr. Ferreira offered in evidence a psychosexual evaluation of his personality type and letters of support, both of which he argued demonstrated that he would not have been likely to abuse Gia. Admin. R. 19-20. The Fair Hearing officer, however, noted that this evidence was not dispositive of the issue whether the DSS decision complied with the regulations. Id. 12.